Arie GENGER, Defendant/Counterclaim Plaintiff–Below, Appellant,

v.

TR INVESTORS, LLC, Glenclova Investment Co., New TR Equity I, LLC, New TR Equity II, LLC, and Trans–Resources, Inc., Plaintiffs/Counterclaim Defendants–Below, Appellees.

No. 592, 2010.

Supreme Court of Delaware.

Submitted: May 25, 2011.

Decided: July 18, 2011.

Stephen P. Lamb, Esquire (argued), of
Paul, Weiss, Rifkind, Wharton & Garrison

LLP, Wilmington, Delaware; Of Counsel: Eric Alan Stone and Jaren Elizabeth Janghorbani, Esquires, of Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York; for Appellant.

Thomas J. Allingham II (argued), Anthony W. Clark and Robert A. Weber, Esquires, of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware; for Appellees.

Kevin F. Brady, Esquire, of Connolly Bove Lodge & Hutz LLP, Wilmington, Delaware; Of Counsel: Daniel B. Garrie, Esquire, of Focused Solution Recourse Delivery Group, LLC, Bellevue, Washington; for Amici Curiae Focused Solution Resource Delivery Group, the Organization of Legal Professionals, and Security Mentors, LLC.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

JACOBS, Justice:

This appeal arises out of a contest for control of Trans–Resources, Inc. ("Trans–Resources"), a Delaware corporation. The Trump Group, whose members are the plaintiffs-below appellees,[1] brought a Court of Chancery action under 8 *Del. C.* § 225[2] against Arie Genger ("Genger"), the defendant-below appellant,[3] to determine which stockholder group possessed the majority voting interest entitled to elect the Trans–Resources board of directors. In two separate opinions and a final judgment order, the Court of Chancery concluded that the Trump Group collectively owned 67.7477% of the Trans–Resources shares, and that the Trump Group's majority vote would determine the lawful membership of the corporation's board.[4] The Court of Chancery also determined that Genger had violated a *status quo* court order prohibiting the destruction of certain electronically stored documents and materials pending the litigation, and sanctioned Genger for those violations.[5] For the reasons discussed below, we affirm in part and reverse in part the judgment of the Court of Chancery.

## FACTUAL AND PROCEDURAL BACKGROUND[6]

### A. The Stockholders Agreement

In 1985, Genger[7] formed Trans–Resources, a Delaware corporation that specializes in manufacturing fertilizer and

---

1. The Trump Group, who are also counterclaim defendants, include TR Investors, LLC ("Investors"), Glenclova Investment Co. ("Glenclova"), New TR Equity I, LLC, and New TR Equity II, LLC (collectively, the "Trump Group").

2. 8 *Del. C.* § 225 (authorizing the Court of Chancery to "determine the validity of any election, appointment, removal, or resignation of any director or officer of any corporation, and the right of any person to hold or continue to hold such office...").

3. Genger is also a counterclaim-defendant below.

4. Final Judgment Order at ¶ 7, C.A. 3994 (Del. Ch. Aug. 18, 2010) (the "Final Judgment Order"); *TR Investors, LLC v. Genger*, 2010 WL 3279385 (Del.Ch. Aug. 9, 2010) (the "*Side Letter Op.*"); *TR Investors, LLC v. Genger*, 2010 WL 2901704, at *22 (Del.Ch. July 23, 2010) (the "*Merits Op.*").

5. *TR Investors, LLC v. Genger*, 2009 WL 4696062, at *12, 16 (Del.Ch. Dec. 9, 2009) (hereinafter "*Spoliation Op.*").

6. The facts recited are based on the Court of Chancery's post-trial findings of fact.

7. Because the Genger family members all share the same last name, we refer to Sagi, Orly, and Dalia Genger by their first names to avoid confusion with Arie.

producing chemicals for agricultural use. Trans–Resources was wholly owned by TPR Investment Associates, Inc. ("TPR"), an entity that in turn was wholly owned by Genger, his wife, and his family trusts. As TPR's majority shareholder, Genger also controlled Trans–Resources. Genger's wife, Dalia, and their two children, Orly and Sagi, held minority shareholder interests in TPR. The children's TPR shares were held in two separate trusts, the "Orly Trust" and the "Sagi Trust," respectively.

Although initially successful, by 2001 Trans–Resources was nearly insolvent. Its bonds were trading at a fraction of their $230 million face value. Genger attempted to negotiate a resolution with Trans–Resources' bondholders, but those negotiations were unsuccessful and Trans–Resources faced the prospect of bankruptcy. Jules Trump ("Jules"),[8] a close friend of Genger for nearly 25 years, viewed this state of affairs as a valuable business opportunity and caused two Trump Group members, Glenclova and Investors, to purchase $220 million (face value) of Trans–Resources' bonds for $25 million.

Glenclova and Investors then entered into an agreement with Trans–Resources and TPR to convert their bond holdings into an equity interest in Trans–Resources (the "Stockholders Agreement"). Under the Stockholders Agreement, Genger's equity ownership interest in Trans–Resources (through TPR) was reduced from 100% to 52.85%, and Glenclova and Investors owned the remaining 47.15%. In exchange for agreeing to become minority shareholders, Glenclova and Investors extracted certain protections, including significant board representation and veto

rights. Those protections were embodied in the Stockholders Agreement.

Glenclova and Investors also sought to ensure that TPR (or some other acceptable Genger-controlled entity) would be the only other Trans–Resources stockholder. To accomplish that, the Stockholders Agreement restricted the transfer of Trans–Resources shares to any persons or entities except those that were designated therein as "Permitted Transferees." If a party to the agreement wished to transfer or sell its shares to a non-Permitted Transferee, the selling party must first give written notice to the other Trans–Resources shareholders, who would then have a right of first refusal. A transfer that failed to comply with those restrictions and the prior notice requirement would automatically be deemed invalid and void, and would trigger the non-selling shareholders' right to purchase the invalidly-transferred shares (the "Purchase Rights").[9]

## B. *The 2004 Transfers*

On October 26, 2004, Arie and Dalia Genger divorced. In the Gengers' divorce settlement agreement, Arie Genger represented that "[e]xcept for the Consent of TPR ... no consent, approval or similar action of any person is required in connection with the transfer of [Trans–Resources] Stock as contemplated hereby...." That representation was false. In fact, the prior consent of the Trump Group signatories to the Stockholders Agreement (*i.e.*, Glenclova and Investors) was required.

---

8. As with the Genger family, the Trump family members all share the same last name. We refer to Jules and Eddie Trump by their first names to avoid confusion.

9. Under the Stockholders Agreement, a non-selling shareholder's Purchase Rights would also be triggered if the improper transfer resulted in a change of control of the selling party.

Three days later, on October 29, 2004, Genger transferred his controlling stock interest in TPR to Dalia. Simultaneously, he caused TPR to transfer its 52.85% ownership in Trans–Resources as follows: (i) to himself, approximately 13.9% of those shares; and (ii) to each of the Orly Trust and the Sagi Trust, approximately 19.5% of those shares. Those transfers are collectively referred to in this Opinion as the "2004 Transfers." Under the agreement that documented the 2004 Transfers, the trustees of both Trusts purported to give irrevocable lifetime proxies to Genger to vote the Trans–Resources shares held by each Trust (the "Irrevocable Proxies" or "Proxies").

## C. *The Funding Agreement and The 2008 Purchase Agreement*

When he effectuated the 2004 Transfers, Genger knew that neither Trust was a "Permitted Transferee" of the Trans–Resources shares under the Stockholders Agreement. Despite that, Genger did not notify Glenclova or Investors of the 2004 Transfers, nor did he provide to those Trump Group entities copies of the Irrevocable Proxies or his divorce settlement agreement. Genger claims, nonetheless, that Glenclova and Investors had actual notice of the 2004 Transfers, because he (Genger) orally told Jules about them on several occasions. In both the trial court and this Court, the Trump Group (and Jules) disputed that claim, and steadfastly insisted that Genger never told them of the 2004 Transfers. All parties agree that Genger never formally or specifically disclosed the 2004 Transfers to Glenclova or Investors until June 2008—four years after those transactions took place. That disclosure was made in the circumstances next described.

During the spring of 2008, Trans–Resources again ran into financial difficulty

and was facing foreclosure on an overdue bank debt. Again, the Trump Group stepped in and offered to provide Trams–Resources the additional funding needed for repayment—this time, however, in exchange for additional equity that would give Glenclova and Investors majority voting control. Genger agreed to those terms, which were documented in the "2008 Funding Agreement." On June 13, 2008, Genger met with Eddie Trump ("Eddie") and Mark Hirsch, the Trump Group's general counsel ("Hirsch"), to discuss the Funding Agreement. At that meeting, Hirsch handed Genger—and asked him to verify—a document that identified and listed the Trans–Resources stockholders as TPR, Glenclova, and Investors. Confronted with that verification request, Genger had no choice but to disclose that: (i) TPR was no longer a stockholder of Trans–Resources, and (ii) TPR's shares in Trans–Resources had been transferred to himself and to the Orly and Sagi Trusts four years earlier, in the 2004 Transfers. Genger claims, nonetheless, that at that meeting and thereafter, the Trump Group "ratified" the 2004 Transfers. The Trump Group assiduously contest that claim as well.

On June 25, 2008, the Trans–Resources board and stockholders met to consider and approve the 2008 Funding Agreement. At that meeting, the Trump Group representatives expressed their frustration over Genger's (hitherto undisclosed) violation of the Stockholders Agreement. At no point during that meeting or thereafter did the Trump Group tell Genger or anyone else that they approved the 2004 Transfers. To induce the Trump Group to enter into the Funding Agreement, Genger assured them that Glenclova and Investors would obtain majority voting control of Trans–Resources. Genger also promised that the Trump Group would not encounter any objection from Sagi, Genger's then-es-

tranged son, to Genger voting the Sagi Trust's Trans–Resources shares under the Irrevocable Proxy. Based on those representations, the Trump Group decided to proceed with the Funding Agreement.

All that turned out to be wasted effort, however, because shortly thereafter Genger backed out of the 2008 Funding Agreement, having devised a solution that would avoid relinquishing his control of Trans–Resources. That solution was to "upstream" sufficient funds from a Trans–Resources subsidiary to pay Trans–Resources' overdue bank debt. The end result was that Trans–Resources no longer needed the additional capital promised by the 2008 Funding Agreement, and the Trump Group did not obtain their promised majority voting control. Having backed away from the 2008 Funding Agreement, Genger then threatened, at an August 1, 2008 meeting, to sue the Trump Group if they challenged the legal validity of the 2004 Transfers.

In response to Genger's litigation threat, on August 8, 2008, Glenclova invoked its Purchase Rights, conferred by the Stockholders Agreement, to acquire all the Trans–Resources shares purportedly covered by the 2004 Transfers.[10] Genger rejected that Purchase Rights invocation, claiming that he had previously informed Jules of the 2004 Transfers at the time of his divorce, and, thus, whatever Purchase Rights Glenclova may have obtained under the Stockholders Agreement had long expired. In response to Genger's refusal to

honor its claimed Purchase Rights, Glenclova filed a lawsuit in the United States District Court for the Southern District of New York (the "New York litigation") to enforce the Stockholders Agreement, including its Purchase Rights provision.[11] The New York litigation is still pending.

Aware that the New York litigation would be lengthy and perhaps take years to resolve, the Trump Group decided upon a more efficient and expedited course of action: to acquire the Trans–Resources shares that TPR purportedly transferred to the Sagi Trust in the 2004 Transfers (the "Sagi Trust Shares"). Because the Sagi Trust Shares represented a 19.5% stock interest, their acquisition would enlarge the Trump Group's equity interest in Trans–Resources to one of absolute majority control-approximately 67% of the company's voting power. On August 22, 2008, the Trump Group, TPR, and the Sagi Trust reached, and formally entered into, an agreement (the "2008 Purchase Agreement") under which the Trump Group purchased the Sagi Trust Shares. Section 10 of the 2008 Purchase Agreement provided that if the 2004 Transfers were determined to be legally void—as the Trump Group claimed they were—then the Sagi Trust Shares would be deemed—and treated as if they had been—transferred to the Trump Group directly by TPR (now controlled by Sagi),[12] and not by the Sagi Trust. The purpose of Section 10 was to enable the Trump Group to "cover all its bases," regardless of the outcome of the

10. Specifically, the Trump Group claims that its Purchase Rights were triggered by two independent events, to which the Trump Group never consented: (1) when the Trump Group was not given the opportunity to exercise its first refusal rights as to the 2004 Transfers; and (2) when Genger transferred his majority ownership interest in TPR to Dalia as a result of their divorce settlement agreement, which resulted in a change of

control of TPR. *See* Complaint at ¶ 2–3, Case No. 08–CIV–7140 (JFK) (S.D.N.Y. Aug. 11, 2008).

11. *Glenclova Inv. Co. v. Trans–Resources, Inc.,* Docket No. 08–CIV–7140 (JFK) (S.D.N.Y.).

12. Sagi and Dalia serve as the directors of the TPR board, and Sagi is the chief executive officer of TPR.

legal dispute with Genger over the validity of the 2004 Transfers.

That same day, the Trump Group entered into a separate agreement (the "Side Letter Agreement") with TPR (represented by its controller, Sagi), wherein the Trump Group acquired an option to purchase the Trans–Resources shares purportedly transferred to Genger and to the Orly Trust in the 2004 Transfers.[13] The Side Letter Agreement would be triggered only if the 2004 Transfers were judicially determined to be legally void. In that event, the legal and beneficial ownership of those shares would be deemed to have remained with TPR. The only signatories to the Side Letter Agreement were the Trump Group and TPR.[14] The Orly Trust was not a signatory, nor was Genger.

### D. The Section 225 Chancery Action

By purchasing the Sagi Trust Shares, the Trump Group now owned (through its affiliated entities) the majority equity position in Trans–Resources. On August 25, 2008, the Trump Group exercised its newly-acquired voting control by executing and delivering a written shareholder consent that: (1) removed Genger as a Trans–Resources director, (2) elected Eddie and Hirsch to the Trans–Resources board, and (3) confirmed the prior election of Jules and of Robert Smith to that board. Genger refused to recognize the Trump Group's written consent, claiming that it was invalid and of no legal effect.

The next day, August 26, 2008, the Trump Group filed a Delaware Court of Chancery action under 8 *Del. C.* § 225, for a determination that as Trans–Resources' majority stockholder, the Trump Group was entitled to designate and elect a majority of the members of the Trans–Resources board.[15] The Trump Group's central claim was that the 2004 Transfers were void *ab initio* because: (i) they did not comply with the notice and consent requirements of the Stockholders Agreement, and (ii) therefore, the Trump Group was contractually entitled, under its Purchase Rights, to acquire all of the Trans–Resources shares transferred by TPR in 2004. In response, Genger counterclaimed for a determination that the 2004 Transfers were valid, because he had given Jules oral notice of the 2004 Transfers at the time that transaction occurred, and that Jules did not object. Alternatively, Genger claimed, and asked the Court of Chancery to declare, that: (i) the Trump Group's purchase of the Sagi Trust Shares in 2008 operated to "ratify" the 2004 Transfers, and (ii) as a consequence, Genger continued to control Trans–Resources and was entitled to elect a majority of its board.

On September 26, 2008, one month after the Trump Group commenced the Section 225 action, the parties settled their dispute and entered into a stipulated final judgment, which the Court of Chancery approved. That stipulated judgment declared that the Trump Group's designees

---

13. Specifically, the Side Letter Agreement required that TPR, "upon written request from the [Trump Group] ... take all necessary action to effect the transfer of [the disputed Trans–Resources] Shares...."

14. Sagi signed the Side Letter Agreement on behalf of TPR, in his capacity as president of TPR.

15. As discussed in *infra*, Part III, the Trump Group initially sought a determination of which stockholder group was entitled to elect four of the six Trans–Resources directors. By the time this case was appealed to this Court, however, the scope of the Section 225 action had been expanded, by agreement of all parties, to encompass a determination of which group was entitled to elect the remaining two directors, as well.

constituted a lawful majority of the Trans–Resources board.

### E.  The Re–Opening of the Section 225 Action and The Spoliation Opinion

Unfortunately, that did not end the dispute. Two weeks after the entry of the stipulated final judgment, the Trump Group moved for relief from that judgment and to re-open the Section 225 proceeding. The Trump Group claimed that, after taking control of Trans–Resources, they discovered that Genger had destroyed documents relevant to the Section 225 action in violation of a document preservation order entered by the Court of Chancery on August 29, 2008 (the "Status Quo Order"). The Vice Chancellor granted the Trump Group's motion and re-opened the case. After conducting a trial in September 2009, the trial court concluded that Genger had violated, and was in contempt of, the Status Quo Order, because he had caused the deletion of files stored on his work computer at Trans–Resources.[16] The trial court further found that after deleting those computer files, Genger directed an employee to use special software that "wiped" the unallocated free space on both his computer's hard drive and on a Trans–Resources computer server. That made it impossible, even by use of computer forensic techniques, to recover any deleted files that were stored in those computers' unallocated free space.[17]

As a sanction for those acts of spoliation, the Court of Chancery raised Genger's evidentiary burden by one level. That is, on any issue in which Genger had the burden of proof, he would have to satisfy that burden by clear and convincing evidence, rather than by a preponderance of the evidence.[18] Because Genger's conduct called his credibility into question, the trial court also ruled that Genger's uncorroborated testimony would not be sufficient to establish any material fact.[19] Finally, the trial court awarded the Trump Group $750,000 of the attorneys' fees they incurred to investigate and litigate Genger's spoliation of computer documents.[20] The parties later agreed that Genger would pay an additional $3.2 million fee to the Trump Group, an amount that the court also awarded.[21]

### F.  The Merits Opinion and The Side Letter Opinion

In December 2009, the Court of Chancery conducted a separate trial on the merits of the Section 225 claims. In its Merits Opinion, handed down on July 23, 2010, the trial court determined that the Trump Group lawfully possessed a majority voting interest and the resulting right to elect the majority of Trans–Resources' board.[22] Specifically, the Court of Chancery found that Genger never notified the Trump Group of the 2004 Transfers until

---

16. *Spoliation Op.*, 2009 WL 4696062, at *12, 16 (Del.Ch. Dec. 9, 2009).

17. *Id.* at *16–17.

18. *Id.* at *18–19.

19. *Id.*

20. *Id.* at *19.

21. The $3.2 million represented the additional reasonable expert fees, technology consultant

fees, special master fees, and other unreimbursed expenses incurred in investigating and litigating Genger's spoliation of evidence. Final Judgment Order at ¶ 16, C.A. 3994 (Del. Ch. Aug. 18, 2010); *see also TR Investors, LLC v. Genger*, 2010 WL 541687 (Del.Ch. Feb. 3, 2010) (distinguishing between the attorneys' fees, and the expert and technology consultant fees incurred during the investigation of Genger's spoliation).

22. *Merits Op.*, 2010 WL 2901704, at *22 (Del. Ch. July 23, 2010).

June 13, 2008.[23] Nor did the Trump Group ever "ratify" the 2004 Transfers after that disclosure, for two separate reasons. First, the Trump Group repeatedly and steadfastly took the position that the 2004 Transfers had occurred in violation of the Stockholders Agreement.[24] Second, Genger failed to prove that the Trump Group had "benefited in any way that suggests ratification," especially given Genger's repudiation of the 2008 Funding Agreement before it was ever signed.[25] Finally, the Court of Chancery held that even if the Trump Group had implicitly ratified the 2004 Transfers, the Trump Group still had lawful voting control of Trans–Resources, because they acquired the Sagi Trust Shares free of the Irrevocable Proxy.[26] The Trump Group, therefore, owned the Sagi Trust Shares by virtue of the 2008 Purchase Agreement, unburdened by any right of Genger to vote those Shares. That 2008 acquisition gave the Trump Group majority voting control of Trans–Resources and the concomitant right to designate and elect four of the company's six directors.

Two weeks later, after issuing its Merits Opinion, the Court of Chancery issued a supplemental opinion (the "Side Letter Opinion") on August 9, 2010.[27] The Side Letter Opinion addressed the ownership of the Trans–Resources shares purportedly transferred to the Orly Trust (the "Orly Trust Shares") and to Genger (the "Genger Shares") in the 2004 Transfers. In the Side Letter Opinion, the Vice Chancellor acknowledged that the Orly Trust "was not formally before the court" in any capacity.[28] The court determined, nonetheless, that neither Genger nor the Orly Trust beneficially owned any Trans–Resources shares.[29] Rather, the Genger Shares and the Orly Trust Shares continued to be owned by TPR, with the result that Trans–Resources "need not recognize Genger or the Orly Trust as stockholders."[30] Therefore, under the Side Letter Agreement, the Trump Group was entitled to vote both the Genger Shares and the Orly Trust Shares, and thereby elect the remaining two members of the six-person Trans–Resources board.[31]

Genger has appealed from the final judgment that flows from all three of these opinions—the Spoliation, the Merits, and the Side Letter Opinions.

### ANALYSIS

Genger raises three claims of error on this appeal. *First,* as to the Spoliation Opinion, he contends that the Court of Chancery erroneously concluded that he destroyed evidence in violation of the Status Quo Order; consequently, the court abused its discretion by finding him in contempt and by awarding sanctions en-

23. *Id.* at *13.

24. *Id.* at *16.

25. *Id.*

26. *Id.* at *20–21.

27. *Side Letter Op.,* 2010 WL 3279385 (Del.Ch. Aug. 9, 2010).

28. *Id.* at *1.

29. *Id.* at *3; *see also* Final Judgment Order at ¶ 9, C.A. 3994 (Del. Ch. Aug. 18, 2010) ("Arie Genger and the Orly Genger Trust are not ... the record or beneficial owners of any Trans–Resources shares.").

30. *Side Letter Op.* at *3; *see also* Final Judgment Order at ¶ 8 ("TPR is the record and beneficial owner of all Trans–Resources shares not presently owned by [the Trump Group].").

31. *Side Letter Op.* at *3 ("[T]he Trump Group may purchase the [Genger] and Orly [Trust] Shares per the terms of the [Side] Letter Agreement, may vote those shares....")

tirely disproportionate to any violation. *Second*, as to the Merits Opinion, Genger claims that the Court of Chancery erred by concluding that: (i) the Trump Group never ratified his transfer of Trans–Resources shares to the Sagi Trust (as part of the 2004 Transfers), and (ii) the Irrevocable Proxy associated with the Sagi Trust Shares was invalid and unenforceable. *Third*, Genger argues that the trial court exceeded its jurisdiction by adjudicating, in the Side Letter Opinion, the beneficial ownership of the Orly Trust Shares and the Genger Shares, because neither the Orly Trust nor TPR—both indispensable parties to any such adjudication—were properly before the trial court or subject to its *in personam* jurisdiction.

Genger's claims rest, in whole or in part, on the premise that the trial court erred as a matter of law. We review a trial court's formulation and application of legal principles *de novo.*[32] To the extent that Genger attacks the trial court's factual findings, we will not disturb those findings unless they are clearly erroneous and not supported by the record.[33]

### I. The Spoliation Opinion

Genger's first claims that because the Court of Chancery erroneously found that he caused material evidence to be spoliated, it abused its discretion by holding him in contempt of the August 29, 2008 Status Quo Order. Alternatively, Genger argues

that even if the trial court's contempt and spoliation findings are correct, the resulting sanctions were an abuse of the court's discretion, because the $3.2 million expert and attorneys' fee award was disproportionate and excessive.

■ A trial court has broad discretion to fashion and impose discovery sanctions.[34] In exercising appellate review, this Court "will not disturb a trial judge's decision regarding sanctions imposed for discovery violations absent an abuse of discretion."[35] "Although we may not substitute our own notions of what is right for those of the trial judge, the trial judge's decision to impose sanctions must be just and reasonable."[36] To the extent a decision to impose sanctions is factually based, we accept the trial court's factual findings so long as they are sufficiently supported by the record, are the product of an orderly and logical reasoning process, and are not clearly erroneous.[37] Moreover, "[where] factual findings are based on determinations regarding the credibility of witnesses ... the deference already required by the clearly erroneous standard of appellate review is enhanced."[38]

For the reasons that follow, we conclude that Genger's arguments are without factual or legal merit. We therefore uphold the Court of Chancery's spoliation and

**32.** *Oberly v. Kirby,* 592 A.2d 445, 462 (Del. 1991).

**33.** *Osborn v. Kemp,* 991 A.2d 1153, 1158 (Del. 2010).

**34.** *Lehman Capital v. Lofland,* 906 A.2d 122, 131 (Del.2006).

**35.** *Id.* (internal quotation marks and alteration omitted); *see also Cabrera v. State,* 840 A.2d 1256, 1263 (Del.2004) ("We review for abuse of discretion the sanction imposed by a trial court because of a discovery violation.").

**36.** *Lehman Capital,* 906 A.2d at 131 (quoting *Chavin v. Cope,* 243 A.2d 694, 695 (Del.1968) and *In re Rinehardt,* 575 A.2d 1079, 1082 (Del.1990)) (internal quotation marks and alteration marks omitted).

**37.** *Stegemeier v. Magness,* 728 A.2d 557, 561 (Del.1999).

**38.** *Cede & Co. v. Technicolor, Inc.,* 758 A.2d 485, 491 (Del.2000).

contempt findings and the resulting sanctions imposed.

A. *Was There A Basis For The Trial Court To Find Spoliation And Adjudicate Contempt?*

Genger first claims that the evidence was insufficient to establish that he had destroyed relevant documents or that the Trump Group was thereby prejudiced. Because there can be no spoliation without a factually-grounded determination that documents were destroyed, Genger argues, the trial court's spoliation finding lacks record support. Moreover, because the Status Quo Order did not expressly require the unallocated free space on his computer's hard drive to be preserved, no spoliation or contempt finding would be proper.[39] That Order directed only that the parties refrain from "tampering with, destroying or in any way disposing of any [Trans–Resources]–related documents, books or records." Because no provision in the Status Quo Order expressly addressed his computer's unallocated free space, Genger claims that the trial court erred by adjudicating him in contempt.

Genger also urges us to reverse on a broader ground—namely, that requiring a party-litigant to preserve a computer's unallocated free space whenever a document-retention policy is in place, would impossi-

---

**39.** In computing terms, "unallocated space" refers to the logical (as opposed to physical) space on a hard drive that the computer's operating system, such as Microsoft Windows, *can* write to, because it is considered empty or "free." Unallocated space is the opposite of "allocated" space, which is the space on the hard drive where the operating system has already written data files to. Normally, files can only be written to the unallocated "free" space. *See, e.g., What is unallocated space?*, WHERE IS YOUR DATA? (Oct. 3, 2008), http://whereismydata.wordpress.com/ (hereinafter "*Unallocated Space* ").

On a new (or newly-formatted) hard drive, virtually all of the hard drive space is unallocated space. That unallocated space is normally filled with zeros (as opposed to ones). As the computer writes files to the hard drive, the zeros are overwritten with the file data. When a file is deleted from a computer, the computer's operating system marks the previously allocated space as unallocated. The data from the file itself, however, remains on the hard drive. *See, e.g., Nucor Corp. v. Bell*, 251 F.R.D. 191, 198 (D.S.C.2008) (explaining unallocated space as it relates to deleted files). For example, assume that a user saves a 10GB movie file onto a new 500GB hard drive. Once the movie file's data is written to the hard drive, the computer's operating system recognizes that the hard drive is 2% allocated space (*i.e.*, the movie file), and 98% unallocated space. If the user now deletes the movie file, the operating system updates the hard drive status to show that there is 100% unallocated space. Of the 500GB of unallocated space, 10GB of that would be the old movie file data, while the remaining 490GB would be zeros. *See, e.g., Unallocated Space*. With normal computer usage, until new files are written to the hard drive, the movie file data will remain deleted but still be recoverable from the hard drive. Even if new files are written to the hard drive, those new files must overwrite the same unallocated space as the movie file data, before the movie file is destroyed and becomes unrecoverable. *See, e.g., Nucor*, 251 F.R.D. at 198; *MMI Products, Inc. v. Long*, 231 F.R.D. 215, 216 (D.Md.2005).

By using special software, computer forensic experts can recover the 10GB movie data file, even though that file has already been deleted by the user. This recovery process, however, can be performed only if the unallocated free space has not been "wiped"—*i.e.*, overwritten with zeros—or written over with new data files. In the example above, wiping the unallocated free space would result in overwriting the old movie data with zeros, thereby making recovery of that movie file impossible. *See, e.g., Leon v. IDX Sys. Corp.*, 464 F.3d 951, 956 (9th Cir.2006) (affirming district court's finding that the unallocated free space on a user's computer had been .intentionally wiped, thereby making recovery of any files in that space impossible); *Krumwiede v. Brighton Assoc., L.L.C.*, 2006 WL 1308629, at *5 (N.D.Ill. May 8, 2006) (explaining how defragmentation will overwrite existing unallocated space).

bly burden a company-litigant by effectively requiring the company to refrain from using its computers entirely. Genger argues that in the course of a computer's normal operation, its operating system is constantly overwriting the unallocated free space by creating and deleting temporary files.[40] Given that technological reality, to expand the scope of a routine document-retention order so as to require preservation of unallocated free space would impose an unworkable standard.[41]

We do not read the Court of Chancery's Spoliation Opinion to hold that as a matter of routine document-retention procedures, a computer hard drive's unallocated free space must always be preserved. The trial court rested its spoliation and contempt findings on more specific and narrow factual grounds—that Genger, despite knowing he had a duty to preserve documents, intentionally took affirmative actions to destroy several relevant documents on his work computer. These actions prevented the Trump Group from recovering those deleted documents for use in the Section 225 and the New York litigations.[42] The record establishes that Genger acted furtively, by (among other things) directing an employee to wipe his computer's unallocated free space using a program called "SecureClean" at around 1:00 a.m. on September 8, 2008.[43] Thereafter, that same employee ran SecureClean on the Trans–Resources company server on September 10, 2008.[44] At no point did Genger ever consult with the Trump Group or its counsel before directing that those actions be taken.

The Trump Group remained unaware of the impact of Genger's covert conduct until weeks later, when the Trump Group found itself unable to locate copies of documents that should have been available on Genger's work computer.[45] Specifically, copies of eight separate documents and/or emails should have been—but were not—found on either the Trans–Resources company server or Genger's work computer.[46] The

40. For example, every time a user powers on a computer, the computer's operating system will write temporary files to the unallocated hard drive space. Those temporary files are then deleted when the computer is shut down. *See, e.g., Mintel Int'l Group, Ltd. v. Neergheen,* 2010 WL 145786, at *8 (N.D.Ill. Jan. 12, 2010) (finding that even non-user initiated software may have destroyed data); *Antioch Co. v. Scrapbook Borders Inc.,* 210 F.R.D. 645, 652 (D.Minn.2002) (discussing how normal computer usage may destroy data); *see also Schedule Disk Defragmenter to run regularly,* http://windows.microsoft.com/en-US/windows-vista/Schedule-Disk-Defragmenter-to-run-regularly (indicating that Windows automatically schedules disk defragmentation actions to occur at least once a week to improve computer performance).

41. The *amici curiae,* Focused Solution Recourse Delivery Group, LLC, The Organization of Legal Professionals, and Security Mentors LLC, have also filed a brief in support of Genger's position on broader contention.

42. *Spoliation Op.,* 2009 WL 4696062, at *7, 16 (Del.Ch. Dec. 9, 2009); *see also id.* at *10 ("I do conclude that [Genger] intended to limit the ability of the Trump Group to find additional documents that might aid it in its litigation battles with him.").

43. *Id.* at *7. The record shows that Genger's technology advisor, Oren Ohana, had run SecureClean on the "DeepClean" option, which was the most thorough. The DeepClean option permanently overwrote the unallocated free space on the hard drive with new strings of unintelligible data. *Id.*

44. *Id.*

45. *Id.* at *11–13.

46. *Id.* at *11 (explaining that under the established protocol, where Genger would have saved the relevant files on the Trans–Resources server); *id.* at *12 (identifying eight relevant emails, some with attachments, that were not found on the computer image of Genger's hard drive, and noting that Genger

absence of those documents was determined to have prejudiced the Trump Group, because "[d]ifferent versions of documents or e-mail chains can take on material importance if there are alterations or additions to them. And who received what and when can be crucial." [47] From those missing documents the trial court inferred that other relevant documents would likely have been stored on Genger's computer and/or the Trans–Resources server, and had been permanently deleted and were now unrecoverable. [48] It was on that specific, narrow factual basis that the trial court: (i) found that Genger had spoliated evidence by intentionally destroying documents, (ii) sanctioned him for that spoliation, and (iii) adjudicated him in contempt of the August 29, 2008 Status Quo Order.

█ We affirm the Court of Chancery's findings and resulting sanctions, because the trial court did not abuse its discretion or commit any erroneous finding of law or fact. Our affirmance should not be viewed as extending beyond the confines of this setting—*i.e.*, where a party is found intentionally to have taken affirmative steps to destroy or conceal information to prevent its discovery at a time that party is under an affirmative obligation to preserve that information. It is noteworthy that there is no evidence or claim in this case, that the use of the SecureClean program fell within Trans–Resources' ordinary and routine data retention and deletion procedures. [49]

To avoid future repetitions of the "unallocated free space" issue presented here, we suggest that the parties and the trial court address any unallocated free space question that might arise before a document retention and preservation order is put in place. We recognize that instances may arise where a party-litigant will have a legitimate reason to preserve unallocated free space on a computer's hard drive. In addressing that issue, the parties must be mindful that court-ordered discovery of electronically-stored information should be limited to what is "reasonably accessible." [50] That determination, by its very

"was not a routine 'deleter' " and had accumulated thousands of e-mails in his inbox).

47. *Id.* at *12.

48. *Id.*

49. For example, the outcome perhaps might be different if Trans–Resources had a data retention policy whereby SecureClean was run on employees' computers and the company's servers every three months, and coincidentally, that scheduled run was to occur on September 8, 2008. *See Sears, Roebuck & Co. v. Midcap*, 893 A.2d 542, 548 (Del.2006) (recognizing that the rationale for giving an adverse inference instruction would not necessarily apply where evidence was destroyed "accidentally or where records are purged under a routine document destruction policy."). We also note that other state and federal courts have differed in their approach to determining whether destruction of evidence due to routine document destruction policies warrants sanctions such as an adverse inference instruction. *Compare, e.g., Reish v.* *Penn. State Univ.*, 2011 WL 2015350, at *7 (M.D.Pa. May 24, 2011) (finding no spoliation where document destruction was a function of routine company policy) *with R.F.M.A.S., Inc. v. So*, 271 F.R.D. 13, 24 (S.D.N.Y.2010) (noting that failure to suspend "any routine document destruction or other processes involved in the ordinary course of business that might result in the destruction of potentially relevant evidence" may result in sanctions); *see also Victor Stanley Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 542–553 (D.Md.2010) (comparing the various approaches taken by the United States Circuit Courts of Appeal).

50. *See* FED.R.CIV.P. 26(b)(2)(B) (limiting discovery of electronically-stored information to that which is "reasonably accessible"); *Rimkus Consult. Grp. v. Cammarata*, 688 F.Supp.2d 598, 612 (S.D.Tex.2010) (analyzing the duty to preserve by focusing on proportionality and reasonableness); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216–18 (S.D.N.Y.2003) (recognizing that a corporation does not have a duty to preserve "every"

nature, must be made on a case-by-case basis.[51]

### B. Was the $3.2 Million Fee Award An Abuse of Discretion?

Genger next claims that even if the Court of Chancery's spoliation and contempt findings were correct, the court abused its discretion by awarding the Trump Group an additional $3.2 million in fees as a sanction for those violations. He argues that that fee award was disproportionate to any violations, particularly since the trial court had earlier imposed as sanctions a heightened burden of proof and a prior $750,000 attorneys' fees award.

Assuming without deciding that $3.2 million falls on the higher end of the range of a reasonable fee, the record establishes that Genger expressly waived his right to challenge the reasonableness of that award. The Court of Chancery's Final Judgment Order expressly recites that Genger "agree[d] that he w[ould] not challenge the reasonableness of the amount of such fee award (whether on appeal or otherwise), except on the ground that it was improper to award any sanction ... for [the Court of Chancery's] contempt finding...." [52] Therefore, this issue was not properly preserved for appeal and, at most, is reviewable only for plain error.[53]

We find no plain error. The $3.2 million figure was not arbitrarily determined. The amount of attorneys, expert, and technology consultant fees was hotly contested, and that $3.2 million figure was the result of the parties' compromise.[54] In these cir-

cumstances, the reasonableness of that fee award does not, nor could it, constitute plain error. Consequently, that award must be upheld.

### II. The Merits Opinion

Genger next claims that the Court of Chancery erroneously concluded, in its Merits Opinion, that the Trump Group did not ratify the 2004 Transfer to the Sagi Trust. Genger contends that the Trump Group, by its conduct, twice ratified those transfers after the June 13, 2008 meeting at which the Trump Group was first told about them. Genger also attacks, as legally erroneous, the Vice Chancellor's determination that the Irrevocable Proxy associated with the Sagi Trust Shares was invalid under New York law and that, in any event, the Proxy did not run with the Sagi Trust Shares after those shares were sold to the Trump Group.

Both arguments fail because they ignore the trial court's factual findings and lack legal merit. Our reasons follow.

### A. Did the Trump Group Ratify The 2004 Transfer To the Sagi Trust?

Genger claims that the undisputed facts establish that the Trump Group twice ratified the 2004 Transfers to the Sagi Trust. The first ratification, Genger argues, occurred at the June 25, 2008 meeting when the Trump Group solicited and accepted Genger's vote of the Sagi Trust Shares to approve the (later repudiated) 2008 Funding Agreement. Genger claims that by recognizing his right to vote the Sagi Trust

---

data source, because such a rule would "cripple large corporations ... [that] are almost always involved in litigation").

**51.** *Rimkus Consult. Grp.,* 688 F.Supp.2d at 613.

**52.** Final Judgment Order at ¶ 16, C.A. 3994 (Del. Ch. Aug. 18, 2010).

**53.** *Beebe Med. Ctr., Inc. v. Bailey,* 913 A.2d 543, 550 (Del.2006) (noting that "waiver occurs where a party fails to object or raise that issue on appeal, unless the error is plain.").

**54.** *See* Final Judgment Order at ¶ 16.

Shares, the Trump Group necessarily ratified the disputed 2004 Transfers. The second ratification is said to have occurred when the Trump Group purchased the disputed Trans–Resources shares from the Sagi Trust under the 2008 Purchase Agreement. Without the 2004 Transfers, Genger insists, the Sagi Trust would have had no Trans–Resources shares to sell to the Trump Group. Therefore, the 2004 Transfers were necessarily ratified if the 2008 Purchase Agreement was to have any legal force. Neither argument, in our view, has merit.

■ Ratification is an equitable defense [55] that precludes a party "who [has] accept[ed] the benefits of a transaction from thereafter attacking it." [56] Ratification may be either express or implied through a party's conduct, but it is always a "voluntary and positive act." [57] It is undisputed that the Trump Group never expressly or formally ratified the 2004 Transfers. The Court of Chancery explicitly found that "[a]t no point did the Trump Group tell Genger that it [had] accepted the 2004 Transfers." [58] The sole issue, then, becomes whether the Trump Group, by its post-June 13, 2008 conduct,[59] implicitly ratified the 2004 Transfers. The record establishes that no implied ratification of the 2004 Transfers by the Trump Group ever took place.

■ Implied ratification occurs "[w]here the conduct of a complainant, subsequent to the transaction objected to, is such as reasonably to warrant the conclusion that he has accepted or adopted it, [and] his ratification is implied through his acquiescence." [60] Ratification of an unauthorized act may be found from conduct "which can be rationally explained *only* if there were an election to treat a supposedly unauthorized act as in fact authorized." [61] Ratification may also be found where a party "receives and retains the benefit of [that transaction] without objection, [ ] thereby ratify[ing] the unauthorized act and estop[ping] itself from repudiating it...." [62]

■ The Court of Chancery found "no basis to conclude that the Trump Group assented to the 2004 Transfers by accepting Genger's vote on behalf of the Sagi and Orly Trust[s] in favor of the [2008] Funding Agreement." [63] The record evidence fully supports that finding. The Trump Group never received or retained any benefit from the 2008 Funding Agreement, and ratification is not the only rational explanation for the Trump Group's conduct. The uncontroverted evidence shows

55.  *Frank v. Wilson & Co.*, 32 A.2d 277, 283 (Del.1943).

56.  *Giammalvo v. Sunshine Min. Co.*, 1994 WL 30547 at *10 (Del.Ch. Jan. 31, 1994) (citing *Kahn v. Household Acq. Corp.*, 591 A.2d 166, 177 (Del.1991)), *aff'd* 651 A.2d 787 (Del. 1994).

57.  *Frank*, 32 A.2d at 283.

58.  *Merits Op.*, 2010 WL 2901704, at *16 (Del. Ch. July 23, 2010).

59.  The relevant date is June 13, 2008, because that was when Genger had first informed the Trump Group of the 2004 Transfers. *Id.* at *13–14.

60.  *Frank*, 32 A.2d at 283.

61.  *Dannley v. Murray*, 1980 WL 268061, at *4 (Del.Ch. July 3, 1980) (emphasis added).

62.  *Hannigan v. Italo Petroleum Corp. of Am.*, 47 A.2d 169, 172–73 (Del.1945) (quoting 3 Thompson on Corps., § 2121 (3d ed.)); *Dannley*, 1980 WL 268061, at *4 (noting that implicit ratification "may arise by the retention of benefits with knowledge of the unauthorized acts"); *see also Frank*, 32 A.2d at 282; *Giammalvo*, 1994 WL 30547, at *10.

63.  *Merits Op.*, 2010 WL 2901704, at *16.

that the Trump Group was reluctant to invest additional risk capital into Trans–Resources, and would do that only if given majority voting control. The Trump Group agreed to enter into the 2008 Funding Agreement with Genger, because Genger represented that he "would rectify [his] violation of the Stockholders Agreement by ensuring that the Trump Group had voting control." [64] Moreover—and of critical importance—the parties never performed or even executed the 2008 Funding Agreement, because Genger repudiated it.[65] In these circumstances, the Trump Group's willingness to accept Genger's vote on behalf of the Sagi and Orly Trusts in favor of the 2008 Funding Agreement cannot be fairly viewed as acquiescing in the 2004 Transfers. That is because the Trump Group never received the negotiated benefit (*i.e.*, voting control) that was to be the *quid pro quo* for the Trump Group's alleged willingness to accept and recognize Genger's vote on those Trusts' behalf.[66]

Nor can the Trump Group's conduct after the June 13, 2008 meeting be "fairly viewed only as evincing an intent to approve the unauthorized acts" [67] (here, the 2004 Transfers). Contrary to Genger's assertion, the 2008 Purchase Agreement did not implicitly ratify the 2004 Transfers, because in that 2008 Agreement, the Sagi Trust and TPR expressly conveyed only such interest as they may have had in the disputed Trans–Resources shares. Moreover, in Section 10 of the 2008 Purchase Agreement, both the purported transferor (TPR) and the purported transferee (the Sagi Trust) agreed on a mechanism where-

by the Trump Group's share acquisition would be fully protected if the 2004 Transfers were determined to be void. Thus, the 2008 Purchase Agreement itself fatally undermines any claim that the Trump Group intended, by its conduct, to "ratify" the 2004 Transfers.

At no point did the Trump Group ratify the 2004 Transfers, either expressly or by implication. To the contrary, at all times the Trump Group acted consistently with their position that the 2004 Transfers were void.[68] Genger's ratification claim, therefore, fails on factual and legal grounds.

### B. Were The Sagi Trust Shares Purchased Subject To The Irrevocable Proxy?

Genger next claims that the Merits Opinion erroneously determined that the Irrevocable Proxy was both legally invalid and, in any event, inapplicable to the shares acquired in the 2008 Purchase Agreement. The Court of Chancery held that even if the Trump Group did ratify the 2004 Transfer of the Trans–Resources shares to the Sagi Trust, the Sagi Trust Shares, once acquired by the Trump Group under the 2008 Purchase Agreement, were no longer subject to Genger's Irrevocable Proxy. The court so held for three reasons. First, the Irrevocable Proxy did not explicitly provide that it was to run with the Sagi Trust Shares if those shares were sold, nor did the Proxy explicitly reserve any voting powers to Genger in the event of a sale or transfer.[69] Second, even if the Proxy language was

---

64. *Id.* at *17.

65. *Id.* at *16.

66. *See Hannigan,* 47 A.2d at 172–73; *Dannley,* 1980 WL 268061, at *4.

67. *Dannley,* 1980 WL 268061, at *5.

68. *Merits Op.,* 2010 WL 2901704, at *16 (finding that "the clear and consistent message from the Trump Group to Genger at all relevant times was that the Stockholders Agreement had been violated.").

69. *Id.* at *20.

ambiguous on that point, public policy considerations relating to the separation of voting control from underlying economic stock ownership, which would result in "empty voting," required construing the Proxy strictly against any implied reservation of voting power.[70] Third, and in any case, the Proxy was not "irrevocable" under New York law, because neither Genger nor the Sagi Trust were Trans–Resources shareholders, as Sections 609 and 620 of the New York Business Corporation Law required that they be, at the time the Proxy was executed.[71]

Genger challenges these conclusions. With respect to the third issue—whether the Proxy was "irrevocable" under New York law—Genger claims that both he and the Sagi Trust were, in fact, Trans–Resources shareholders at the time the Proxy was executed. Genger asserts that the Proxy was executed on October 30, 2004, one day after he effectuated the 2004 Transfers to the Sagi Trust and to himself. Therefore, Genger tells us, the Proxy satisfied the requirements of Sections 609 and 620 of the New York Business Corporation Law.

This argument suffers from two fatal flaws. First, it was never fairly presented to the trial court. Second, it is unsupported by the record. Genger represented to the Vice Chancellor that "the Sagi Trust executed the Irrevocable Proxy on October 29, 2004," *the same day* that the 2004 Transfers were executed. At no point did Genger argue to the Court of Chancery (as he now argues to us) that the Irrevocable Proxy was executed *the day after* the 2004 Transfers took place. We therefore decline to consider Genger's first argument, raised for the first time on appeal, because it was never fully and fairly presented to the trial court, as Supreme Court Rule 8 requires.[72]

■ On the second issue—the Irrevocable Proxy's inapplicability—Genger contends that the Court of Chancery read the Proxy language too narrowly, by incorrectly applying a new, uncharted form of "heightened scrutiny" and thereby concluding that the Proxy created "empty voting" concerns. That was error, Genger argues, because the only legal principle applicable here is that a purchaser that buys shares with notice of an irrevocable proxy takes those shares subject to that proxy. Because the Trump Group knew of the existence of the Proxy at the time it negotiated the 2008 Purchase Agreement, Genger claims, that fact alone triggered the Proxy's applicability. That the Proxy contained no language explicitly binding subsequent transferees is of no relevance.

This argument cannot withstand scrutiny either. First, as a matter of law, the Proxy was not "irrevocable," because it did not satisfy the applicable New York statutory requirements. Whether or not the Trump Group knew of the Proxy at the time they purchased the Sagi Trust Shares is immaterial, because a contracting party's knowledge of a proxy's existence can-

---

**70.** *Id.* at *20–21.

**71.** *Id.* at *21. The Court of Chancery found that New York law governed the Irrevocable Proxy. The trial court's choice of law has not been appealed. Under New York law, a proxy is irrevocable where the proxy is held by "[a] person designed by or under paragraph (a) of section 620." N.Y. Bus. Corp. Law § 609(f). Section 620, paragraph (a), applies only to "[a]n agreement between two or more shareholders...." N.Y. Bus. Corp. Law § 620(a).

**72.** Del. Sup.Ct. R. 8; *see also Russell v. State,* 5 A.3d 622, 627 (Del.2010) ("Under Supreme Court Rule 8 and general appellate practice, this Court may not consider questions on appeal unless they were first fairly presented to the trial court for consideration.").

not cure that proxy's non-compliance with controlling statutory requirements, or transmute a terminable proxy into one that is irrevocable under New York statutory law.

Finally, and apart from its failure to satisfy applicable statutory requirements, the Proxy's plain language defeats Genger's position. The Proxy relevantly provided that:

> The [Sagi Trust] ... does hereby constitute and appoint Arie Genger ... to vote as its proxy, all shares of common stock of [Trans–Resources] *which are now or hereafter owned by the Trust,* at any and all meetings of the stockholders of Trans–Resources....

Contrary to Genger's claim, the Court of Chancery did not interpret that Proxy language too narrowly. By its plain terms, the Proxy language applied only to the Trans–Resources shares "owned" by the Sagi Trust. That is, the Proxy would attach only to those Trans–Resources shares that were "now or hereafter *owned by the Trust.*" The Proxy contains no provision that would bind any *subsequent* owner of those shares. Once sold or transferred to a subsequent owner, those shares were no longer "owned by the [Sagi] Trust" and therefore, were no longer subject to the Proxy. Genger cannot complain that the trial court erroneously interpreted the Proxy where its plain language compels that interpretation.

For these reasons, we uphold the judgment of the Court of Chancery insofar as it adjudicates the merits of the Trump Group's Section 225 claims.

### III. The Side Letter Opinion

Genger's third and final claim of error is that the Court of Chancery exceeded its authority by deciding the issues addressed in its August 9, 2010 Side Letter Opinion. That opinion (to reiterate) invalidated the 2004 Transfers of Trans–Resources shares to the Orly Trust and to Genger himself, and adjudicated the Trump Group as the lawful record and beneficial owner of those transferred shares.[73]

In its Merits Opinion, the trial court initially declined to reach the ownership issues relating to the Orly Trust and the Genger Shares, because those issues were "unnecessary" to resolve the Section 225 voting control dispute.[74] Later, however, in its supplemental Side Letter Opinion, the court noted that: (i) in deciding the Section 225 issues, it had overlooked the 2008 Side Letter Agreement, and (ii) it was necessary to determine who owned the Orly Trust Shares and the Genger Shares, because the right to elect two of the Trans–Resources' six directors would arguably depend upon that determination.[75] The trial court justified adjudicating the ownership of the Genger Shares at that late stage, because Genger "himself sought to have this court declare who was the rightful owner of the [Genger] and Orly [Trust] Shares."[76] In its Final Judgment Order, the court ultimately determined that neither Genger nor the Orly Trust were "the record or beneficial owners of any Trans–Resources shares,"[77] and

**73.** *Side Letter Op.,* 2010 WL 3279385 (Del.Ch. Aug. 9, 2010).

**74.** *Merits Op.,* 2010 WL 2901704, at *19 ("I do not issue any ruling as to [the Orly Trust] shares, because that is unnecessary in this § 225 action."); *see also id.* (finding that requiring Genger to transfer all of his Trans–Resources shares to TPR to be "unnecessary to this control dispute and therefore this § 225 action.").

**75.** *Side Letter Op.,* 2010 WL 3279385, at *1.

**76.** *Id.*

**77.** Final Judgment Order at ¶ 9, C.A. 3994 (Del. Ch. Aug. 18, 2010).

that TPR was "the record and *beneficial owner* of all Trans–Resources shares not presently owned by the [Trump Group]." [78]

In an about-face, Genger now claims that the Court of Chancery lacked the power to determine that the Trump Group lawfully purchased the Orly Trust Shares and the Genger Shares from TPR. He first argues that the trial court lacked *in personam* jurisdiction over the Orly Trust and TPR, because neither stockholder was made a party to the Section 225 action in any capacity. Second, he claims that all the Side Letter Agreement gave the Trump Group was an option to purchase the Genger and Orly Trust Shares—an option which was never exercised. Finally, Genger contends that adjudicating the validity of the 2004 Transfers under the Side Letter Agreement exceeded the Court of Chancery's jurisdiction, because the Trump Group's right to buy, and TPR's right to sell, the Genger Shares and the Orly Trust Shares were "collateral" issues, *i.e.*, unnecessary to resolve the merits of the Section 225 claims. We agree with Genger's first claim, do not reach the second, and reject the third.[79]

The purpose of a Section 225 action "is to provide a quick method for review of the corporate election process to prevent a Delaware corporation from being immobilized by controversies about whether a given officer or director is properly holding office." [80] A Section 225 proceeding is summary in character, and its scope is limited to determining those issues that pertain to the validity of actions to elect or remove a director or officer.[81] "In determining what claims are cognizable in a [Section] 225 action, the most important question that must be answered is whether the claims, if meritorious, would help the court decide the proper composition of the corporation's board or management team." [82] If not, then those claims "are said to be 'collateral' to the purpose of a [Section] 225 action and must be raised in a [separate] plenary action." [83]

A Section 225 proceeding is not an *in personam* action. Rather, it is "in the nature of an *in rem* proceeding," [84] where the "defendants" are before the court, not individually, but rather, as respondents being invited to litigate their claims to the *res* (here, the disputed corporate office) or

78. *Id.* at ¶ 8 (emphasis added).

79. Because our disposition of the issues relating to the Court of Chancery's Side Letter Opinion rests on jurisdictional grounds, we do not reach or address Genger's argument that the Side Letter Agreement conferred only an option to purchase the Genger Shares and the Orly Trust Shares, and that the Trump Group never exercised that contractual option.

80. *Box v. Box*, 697 A.2d 395, 398 (Del.1997).

81. *See id.; Nevins v. Bryan*, 885 A.2d 233, 244 n. 34 (Del.Ch.2005); *Adlerstein v. Wertheimer*, 2002 WL 205684, at *7 (Del.Ch. Jan. 25, 2002) ("Because it is summary in nature, a Section 225 proceeding is limited to those issues that must necessarily be considered in order to resolve a disputed corporate election

process."); *Arbitrium (Cayman Islands) Handels AG v. Johnston*, 1997 WL 589030, at *3 (Del.Ch. Sept. 17, 1997) (explaining that a Section 225 proceeding has the limited scope of determining "the validity of a corporate election or to determine the right of a person to hold a corporate office in the event that such office is claimed by more than one person." (citation omitted)).

82. *Agranoff v. Miller*, 1999 WL 219650, at *17 (Del.Ch. Apr. 12, 1999) (internal citation omitted), *aff'd as modified*, 737 A.2d 530 (Table), 1999 WL 636634 (Del.1999).

83. *Id.* (internal citation omitted); *see also Box*, 697 A.2d at 398 (holding that a Section 225 action should not be used "for trying purely collateral issues").

84. *Arbitrium*, 1997 WL 589030, at *4.

forever be barred from doing so. The one exception is the corporation itself, which is the entity that embodies the "*res*," and is only party before the Court in its "individual" capacity. The *in rem* character of a Section 225 action "imposes important limits on the scope of [a] court's remedial powers even as to claims bearing on whether a person lawfully holds corporate office." [85] For example, in a Section 225 action, a plaintiff may claim that a director-respondent does not validly hold corporate office because that director obtained the office through fraud, deceit, or breach of contract. [86] The Court of Chancery may adjudicate that claim in a Section 225 proceeding, but only for the limited purpose of determining the corporation's *de jure* directors and officers. In a Section 225 proceeding the court "cannot go further and actually rescind a transaction procured through such unlawful behavior or award money damages to those harmed by that behavior." [87] That type of ultimate relief can only be obtained in a plenary

action in a court that has *in personam* jurisdiction over any necessary or indispensable parties. [88]

Given the jurisdictional limitations that inhere in a Section 225 action, we affirm the judgment of the Court of Chancery insofar as it determines the *record* ownership of the disputed Trans–Resources shares in the Side Letter Opinion and the Final Judgment Order. All parties agree that the adjudication of record ownership was necessary to determine which side was lawfully entitled to elect the remaining two directors of the Trans–Resources board. We so conclude, even though initially the scope of the Section 225 action was limited to which side—the Trump Group or Genger—had the lawful power to designate the four directors who would comprise the Trans–Resources board majority. [89]

This procedural posture was altered, however, after the Court of Chancery issued its Merits Opinion. At that point, all parties agreed that the scope of the Section 225 action should be expanded to en-

---

85. *Agranoff*, 1999 WL 219650, at *18.

86. *See, e.g., Kahn Bros. & Co. v. Fischbach Corp.*, 1988 WL 122517, at *5 (Del.Ch. Nov. 15, 1988) (examining whether director obtained position via fraud); *Garrett v. Brown*, 1986 WL 6708, at *2, 6–11 (Del.Ch. June 13, 1986), *aff'd*, 511 A.2d 1044 (Del.1986) (addressing whether a stockholder's right of first refusal had been violated in a Section 225 proceeding); *Schroder v. Scotten, Dillon Co.*, 299 A.2d 431, 435–36 (Del.Ch.1972) (deciding whether, under Section 225, the failure to give certain board members notice of special meetings voided the subsequent director elections that occurred at those meetings).

87. *Agranoff*, 1999 WL 219650, at *18; *Marks v. Menoutis*, 1992 WL 22248, at *5 (Del.Ch. Feb. 3, 1992) ("This Court cannot directly order a transaction to be rescinded in a § 225 proceeding.").

88. *Agranoff*, 1999 WL 219650, at *18. The New York litigation is an example of such a plenary proceeding.

89. The Trump Group's complaint initially sought a determination that the Trump Group "ha[d] the right, as majority stockholders, to designate and cause the election of their two new designees to the board and to continue the directorships of their two existing designees." And, in a letter to the trial court, the Trump Group represented that "[t]his summary proceeding concerns a dispute between two groups over which is entitled to elect a *majority* of the board of directors of Trans–Resources...." Even after the stipulated settlement agreement fell through, resulting in the Section 225 action being re-opened and litigated to a conclusion, the Trump Group's position was that "[t]he section 225 action is ... to resolve a dispute over the composition of [Trans–Resources'] board and who is entitled to elect a *majority* of the directors." Similarly, Genger's counterclaim sought a Court of Chancery declaration that he, as majority stockholder, had the sole right to designate and elect four of the six Trans–Resources directors.

compass which side had the right to designate and elect the two remaining Trans–Resources directors. That additional question arose because the parties disputed whether the Trump Group was entitled, under its Purchase Rights conferred by the Stockholders Agreement, to acquire the Trans–Resources shares transferred to Genger and the Orly Trust in the 2004 Transfers.[90] If the Trump Group was so entitled, then as a legal matter those shares would continue to be held by TPR, and Genger and the Orly Trust would have no Trans–Resources shares to vote to elect the remaining two directors. If, however, the Trump Group had no contractual right to purchase the Genger and the Orly Trust Shares, then under the Stockholders Agreement, Genger would be entitled to designate the remaining two Trans–Resources directors.[91] Consequently, despite having earlier concluded that it was unnecessary to address these issues, the Court of Chancery, at the urging of all parties, now decided that it was necessary, and that it had the power to decide which party was entitled to vote the Genger and the Orly Trust Shares in the Section 225 action.

■ If the only new issue decided at this late stage was who constituted the lawful record owners of the Genger and Orly Trust shares, the Court of Chancery's Side Letter Opinion and subsequent Final Judgment Order would pose no problem. The trial court determined that TPR was the record owner and entitled to vote. But, the trial court went further—undoubtedly motivated by a desire to promote litigation efficiency—and adjudicated questions of ultimate beneficial ownership as well. In doing that, however, the Court of Chancery crossed a jurisdictional line and exceeded its powers under Section 225.

■ An adjudication of who has the right to vote disputed corporate shares for Section 225 purposes cannot constitute a binding adjudication of who beneficially owns those shares, because a Section 225 action is by its nature an *in rem*, not a plenary, proceeding. Only in a plenary proceeding before a court that has *in personam* jurisdiction over the litigants may the court adjudicate the litigants' property interest in disputed corporate shares.[92]

90. *Side Letter Op.*, 2010 WL 3279385, at *1 (Del.Ch. Aug. 9, 2010).

91. In that latter scenario, Genger would have a 13.9% stock ownership interest and the Orly Trust would have a 19.5% stock ownership interest. Section 1.2(c) of the Stockholders Agreement provides that:

> If the TPR Stockholders own less than 50% of the outstanding Shares, the group owning the greater number of Shares as between the TPR Stockholders and the Non–TPR Stockholders shall designate four directors and the other group shall, so long as it owns a number of Shares equal to at least 15% of the [ ] Shares [initially purchased], designate two directors.

Under the Stockholders Agreement, a non-Permitted Transferee stockholder is designated as a TPR Stockholder or a Non–TPR Stockholder depending upon which of the two groups it acquired its shares from.

92. *See Staar Surgical Co. v. Waggoner*, 588 A.2d 1130, 1131 (Del.1991) (holding that under Section 225's predecessor statute, the Court of Chancery could not adjudicate equitable ownership of the disputed voting shares). *See also Rosenfield v. Standard Elec. Equip. Corp.*, 83 A.2d 843, 845 (Del.Ch.1951) ("Where conflicting stock claims arise in connection with the review of an election under [Section 225's predecessor statute,] this court has the power, even though the claimants be not parties, to decide who had the right to vote the stock in dispute. This does not of course constitute a binding determination of ownership as between the conflicting claimants unless they are parties who have been served with effective process."); *Technicorp Int'l II, Inc. v. Johnston*, 1997 WL 538671, at *7 (Del.Ch. Aug. 25, 1997) (acknowledging that even a narrow reading of *Rosenfield* holds that "an adjudication of ultimate title to

Here, the Orly Trust and TPR were never made parties to a plenary proceeding where the trial court had *in personam* jurisdiction over them.[93]

In this case, Genger voluntarily asked the trial court to determine that he *beneficially* owned 13.99%, and that the Orly Trust *beneficially* owned 19.43%, of the Trans–Resources shares. To be sure, Genger and the Trump Group were legally free to consent to the Court of Chancery exercising plenary *in personam* jurisdiction over themselves personally. What Genger and the Trump Group could not do, however, was consent to that court's exercising personal jurisdiction over anyone else—in this case the Orly Trust or TPR—without valid authorization. Only those entities, through their authorized representatives, were legally empowered to give their consent.

The Court of Chancery never obtained consensual *in personam* jurisdiction over TPR, which was a party to the 2004 Transfers. Without having consented-to personal jurisdiction over TPR, the trial court could not enlarge the Section 225 proceeding into a concurrent plenary action that would empower the court to determine the ultimate beneficial ownership of the Genger and the Orly Trust Shares.

■ Nor could the trial court exercise personal jurisdiction over the Orly Trust. Although not altogether clear, it appears that personal jurisdiction was exercised on the basis that Orly Genger, a trust beneficiary, had voluntarily appeared as a nonparty witness at the Section 225 trial. That trial did not implicate the beneficial ownership of the Orly Trust Shares,[94] and the Court of Chancery itself acknowledged that the Orly Trust was "not formally before the court."[95] The trial transcript shows that Orly's testimony related only to whether her father, Genger, had verbally informed Jules of the 2004 Transfers either at the time Genger and Dalia divorced or at some point thereafter, before the parties' June 13, 2008 meeting. Orly's willingness to testify before the trial court in her individual capacity as Genger's daughter did not constitute legal consent to the Court of Chancery's exercising *in personam* jurisdiction over the Orly Trust.[96] A separate consent, by an author-

---

(or voiding of) a party's stock is not a remedy available in a § 225 proceeding.").

93. To be more precise, the record contains no evidence that the Orly Trust and TPR were formally summoned or given an opportunity to be heard even in the Section 225 action. Despite that, we affirm the Court of Chancery's record ownership determinations for limited Section 225 purposes, because the Orly Trust's and TPR's interests in the board election were adequately represented by Genger and the Trump Group, respectively, and no party to the Section 225 action has objected to the trial court determining the record ownership of, and right to vote, the TPR and Orly Trust Shares.

94. *Cf. Shaffer v. Heitner*, 433 U.S. 186, 213, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977) (explaining that mere ownership of stock in a Delaware corporation, without more, was insufficient to form a constitutionally sufficient basis for the

court to exercise *in personam* jurisdiction over the stockholder, because the stock sequestered was "not the subject matter of [the] litigation," and that "the underlying cause of action [was not] related to the [stock]").

95. *Side Letter Op.*, 2010 WL 3279385, at *1.

96. *See India S.S. Co. Ltd. v. Kobil Petroleum Ltd.*, 620 F.3d 160, 161–62 (2d Cir.2010) ("Jurisdiction over a person is conceptually distinct from jurisdiction over the person's property.... The validity of an attachment order [over the person's property] therefore is not settled by a court's attainment of *in personam* jurisdiction over the property owner. Consent to one does not imply or effect consent to the other."). *Cf. In re Real Estate Title & Settlement Servs. Antitrust Litig.*, 869 F.2d 760, 770–71 (3d Cir.1989), *cert. denied*, 493 U.S. 821, 110 S.Ct. 77, 107 L.Ed.2d 44 (1989) (concluding that a school board's appearance

ized representative of the Orly Trust, was required to accomplish that, and there is no evidence or claim that such consent was ever obtained.

To summarize, the trial court lacked personal jurisdiction over either the Orly Trust or TPR, which was required for a binding adjudication of the beneficial ownership of their respective stock ownership interests.[97] Without personal jurisdiction over these entities, the Court of Chancery lacked the power to augment TPR's beneficial ownership interest, or diminish the Orly Trust's beneficial ownership interest, in Trans–Resources by adjudicating that TPR beneficially owned the Genger Shares and Orly Trust Shares.[98] Therefore, the beneficial ownership determinations that flow from the Court of Chancery's August 9, 2010 Side Letter Opinion and its August 18, 2010 Final Judgment Order must be reversed.

### CONCLUSION

The judgment of the Court of Chancery is affirmed in so far as it embodies and implements the rulings in the Merits and Spoliation Opinions; and is reversed to the extent it adjudicates the beneficial ownership of the Orly Trust Shares and the Genger Shares based on the determina-

tions made in its August 9, 2010 Side Letter Opinion and August 18, 2010 Final Judgment Order.

in federal district court to move to opt out of class action, and appeal of denial of that motion, did not constitute consent to exercise of personal jurisdiction by district court over the school board); *Trans–Asiatic Oil Ltd., S.A. v. Apex Oil Co.*, 804 F.2d 773, 778–79 (1st Cir.1986) (recognizing that a party's "initial entry of a restricted appearance manifested its lack of consent to personal jurisdiction," but that party's subsequent actions "constituted a waiver of its jurisdictional defenses.").

Although we have recognized that "an individual may submit to the jurisdiction of the court by appearance," those appearances have occurred in the context of "legal arrangements" such as a contractual forum selection clause, an arbitration agreement, or

through a party's voluntary use of certain state procedures such as filing a lawsuit in state court. *Massey v. Ball*, 595 A.2d 390, 394 (Del.1991) (quoting *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703–04, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982)). None of those "legal arrangements" are implicated here.

97. *Rosenfield v. Standard Elec. Equip. Corp.*, 83 A.2d 843, 845 (Del.Ch.1951).

98. Such an adjudication of beneficial ownership can occur only by a court with personal jurisdiction over all indispensable parties. The federal court in the New York litigation would be such a court.