## COURT OF CHANCERY
### OF THE
### STATE OF DELAWARE

JOSEPH R. SLIGHTS III
VICE CHANCELLOR

417 S. State Street
Dover, Delaware 19901
Telephone: (302) 739-4397
Facsimile: (302) 739-6179

Date Submitted: March 16, 2021
Date Decided: June 23, 2021

Richard P. Rollo, Esquire
Sarah A. Clark, Esquire
Angela Lam, Esquire
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19801

R. Karl Hill, Esquire
Seitz Van Ogtrop & Green, P.A.
222 Delaware Avenue, Suite 1500
Wilmington, DE 19801

Re: *Macrophage Therapeutics, Inc. v. Michael M. Goldberg, M.D., et al.*
C.A. No. 2019-0137-JRS

Dear Counsel:

Defendant, Michael M. Goldberg, M.D., has moved for an order (1) holding Claudine Bruck, M.D., Michael Rice and Jed Latkin in contempt for violating this Court's March 13, 2019 Status Quo Order and (2) dismissing the case because the board of directors of Plaintiff, Macrophage Therapeutics, Inc. (the "Board"), purportedly failed to authorize this litigation. For reasons stated below, the motion is denied.

## I. BACKGROUND

The Verified Complaint in this action was filed on February 20, 2019.[1]  Less

than a month later, on March 13, 2019, the Court entered a Status Quo Order that

addressed the operation and governance of Macrophage during the pendency of the

litigation.[2]  Specifically, the Status Quo Order provides that: (1) "[t]he board shall

consist of Goldberg, Bruck and Rice" who "may authorize any act or transaction on

behalf of the Company"; (2) "[a]t least 48 hours in advance of any Board meeting,

the Company shall email Goldberg . . . (i) notice of such Board meeting, and

(ii) copies of any Board materials submitted to all Board members relating to that

Board meeting"; and (3) the Board shall provide Goldberg with notice of its intent

---

[1] D.I. 1.  The Complaint alleged, among other things, that Dr. Goldberg had taken certain unauthorized actions wrongfully to convert Macrophage property for his own benefit in violation of his fiduciary duties.  For a more detailed discussion of the facts, interested readers are referred to the Court's post-trial decision issued today.  *See Macrophage Therapeutics, Inc. v. Goldberg*, C.A. No. 2019-0137-JRS (Del. Ch. June 23, 2021) (D.I. 213) (Opinion) ("Post-Trial Opinion").

[2] D.I. 31 ("Status Quo Order").

to implement certain designated operational changes outside the ordinary course of business.[3]

The matter was tried on December 1–3, 2020.[4]   Dr. Goldberg states that shortly before trial he learned two facts, both of which independently reveal violations of the Status Quo Order.  First, on November 25, 2020, Macrophage's counsel informed Dr. Goldberg that Macrophage's only common stockholder, Navidea Biopharmaceuticals, Inc., had loaned Macrophage between $600,000 and $700,000 to fund this litigation.[5]   This, he says, demonstrates that the funds Macrophage utilized to prosecute this lawsuit, via an inter-company loan from Navidea, are the product of new debt greater than $10,000 incurred by Macrophage, in violation of Paragraph 3(E) of the Status Quo Order.  Second, during the Rule 30(b)(6) deposition of Macrophage's corporate designee on October 26, 2020, Jed Latkin, the current CEO of Macrophage, testified that all research being

---

[3] *Id.* ¶ 3.  Relevant here, the Board was to provide notice to Dr. Goldberg when Macrophage (1) incurred new debt in excess of $10,000 or (2) transferred or otherwise disposed of any Macrophage asset.  *Id.* ¶ 3(D)–(E).

[4] D.I. 176–78 ("Trial Tr.").

[5] Zimmer Decl. (D.I. 174), Ex A.

conducted on Macrophage's behalf had been terminated.[6] Dr. Goldberg argues that because he received no notice that Macrophage had terminated its research, Dr. Bruck, Mr. Rice and Mr. Latkin violated Paragraph 3(D) of the Status Quo Order.

Dr. Goldberg then points to one additional recent discovery he argues requires outright dismissal. On November 30, 2020, certain unredacted Navidea board minutes were produced to Dr. Goldberg that allegedly reveal that Navidea, not Macrophage, authorized the commencement of this litigation.[7] Thus, according to Dr. Goldberg, Macrophage has no business pursuing this litigation in its name.

## II. ANALYSIS

Dr. Goldberg filed this motion on December 10, 2020, precisely one week after the conclusion of trial. The timing alone is troublesome. But I need not go there. The motion is flawed on the merits as well.[8]

---

[6] Zimmer Decl. ¶ 6.

[7] Zimmer Decl., Ex. C.

[8] I note that, like the alleged contemnors, I am perplexed as to why Dr. Goldberg waited roughly two years after entry of the Status Quo Order and one week after trial to bring his motion. As discussed below, Dr. Goldberg knew or should have known years ago that inter-company loans were funding this litigation and that Macrophage was winding down

### A. The Motion for Contempt

"To establish civil contempt, [the petitioning party] must demonstrate that the [contemnors] violated an order of this Court of which they had notice and by which they were bound."[9]  The petitioning party bears the burden of showing contempt by clear and convincing evidence; only upon carrying that burden will "the burden [] shift[] to the contemnors to show why they were unable to comply with the order."[10]  Importantly, to find contempt, the violation "must not be a mere technical one, but must constitute a failure to obey the Court in a meaningful way."[11]

---

its business; neither is a new revelation.  Whether Dr. Goldberg's lack of vigilance is enough to implicate the equitable doctrines of laches, estoppel or acquiescence are open questions that I need not resolve given that, in my view, there have been no meaningful violations of the Status Quo Order in any event.  To be clear, the only reason laches *might* be implicated in connection with a motion for contempt based on a violation of a court order is the concern that the party bringing the motion has intentionally delayed doing so for strategic advantage.  Otherwise, laches is unlikely ever to be a basis to deny the court its discretion to find a party in contempt for intentionally violating a court order.

[9] *TR Invs., LLC v. Genger*, 2009 WL 4696062, at *15 (Del. Ch. Dec. 9, 2009), *aff'd*, 26 A.3d 180 (Del. 2011) (alterations in original) (citation omitted).

[10] *Id.*

[11] *Dickerson v. Castle*, 1991 WL 208467, at *4 (Del. Ch. Oct. 15, 1991) (quotations omitted).

### 1. Bruck, Rice and Latkin Did Not Violate the Status Quo Order

Dr. Goldberg has failed to show, by clear and convincing evidence, that Bruck, Rice or Latkin violated the Status Quo Order, much less intentionally violated the order. As for Dr. Goldberg's argument that Macrophage incurred "new debt" exceeding $10,000 when it accepted the inter-company loan from Navidea to fund this litigation,[12] it is difficult to discern how the alleged contemnors would or should have viewed the loan as "new debt." The debt was secured prior to the entry of the Status Quo Order.[13] Moreover, Dr. Goldberg knew full well that Macrophage operated solely from cash infused by Navidea, that Macrophage's attorneys were getting paid and that Macrophage had been declared insolvent.[14] Indeed,

---

[12] Status Quo Order at ¶ 3(E) (requiring notice to Dr. Goldberg upon Macrophage "incurring any new debt (e.g., establishing new lines of credit, loans, etc.) which exceeds, individually or in combination with related or similar debt, $10,000").

[13] Dr. Goldberg acknowledges as much in his motion by recognizing that Macrophage, an insolvent company, began accruing attorneys' fees prior to the filing of the Complaint and certainly prior to the entry of the Status Quo Order. Def. Michael M. Goldberg's Mot. for Contempt of the Status Quo Order and Other Relief (D.I. 174) at 7.

[14] Trial Tr. 619:21–620:3 (Goldberg); Pl.'s Opp'n Br. to Def. Michael M. Goldberg's Mot. for Contempt of the Status Quo Order and Other Relief ("Opp'n") (D.I. 195) at 6.

Dr. Goldberg knew that Macrophage did not even have its own bank account.[15]

There is no reasonable reading of the Status Quo Order that would require

Macrophage to inform Dr. Goldberg every time Navidea provided cash so that

Macrophage could fund its operations, including the payment of counsel fees. And,

even if that were a technical violation of the Status Quo Order, as mentioned,

technical violations are not enough to support a finding of contempt.

As for the argument that the termination of Macrophage's work and research

without notice to Dr. Goldberg somehow violated the Status Quo Order, that claim

also falls well short of the high bar Dr. Goldberg must clear in order to support a

contempt claim. Paragraph 3(D) of the Status Quo Order requires Macrophage to

provide Dr. Goldberg notice prior to "transferring, encumbering, exchanging,

pledging, loaning, or otherwise disposing of, directly or indirectly, any Company

asset."[16]  But, Navidea terminated the sub-license upon which Macrophage's

research was based  on February 19, 2019, several weeks prior to the entry of the

---

[15] Trial Tr. 608:5–9 (Goldberg); *id.* at 619:21–620:3 (Goldberg).

[16] Status Quo Order at ¶ 3(D).

Status Quo Order.[17] The sub-license agreement (the "Navidea Sub-License Agreement") clearly provides that upon revocation, Macrophage would assist in a smooth transition away from the work Macrophage was doing under the license.[18] Thus, it is not outside the ordinary course of business for Macrophage to terminate its work and research when, prior to the entry of the Status Quo Order, there was a pre-existing requirement to do exactly that based on the cancellation of the Navidea Sub-License Agreement.

Dr. Goldberg recognized as much in his Motion for Modification of Status Quo Order, filed on March 26, 2019, when he asked the Court to require the Board to vote on resolutions that would rescind any prior termination of Macrophage contracts.[19] In seeking a "revision" of the Status Quo Order to this effect, Dr. Goldberg implicitly if not explicitly revealed his understanding that the cancellation of contracts reflecting Macrophage's research was not already

---

[17] Clark Decl. (D.I. 196), Ex. 6. Dr. Goldberg recognized that Navidea had terminated the Macrophage sub-license on February 19, 2019 in his Opposition to Plaintiff's Motion for a Status Quo Order, filed on February 28, 2019. D.I. 18.

[18] Clark Decl., Ex. 7, at § 8.4(vi).

[19] D.I. 40.

addressed in the original Status Quo Order. And, again, to the extent there was some continuation of the plan to cancel Macrophage's research and related operations after the Status Quo Order was entered, at best, those efforts would constitute technical violations of the Status Quo Order that do not rise to the level of contempt.[20]

## 2. Dr. Goldberg Has Failed to Demonstrate Harm

Even if Dr. Goldberg had demonstrated that Bruck, Rice or Latkin were in contempt of court, the lack of demonstrated harm is fatal to his motion. "A court has inherent power to fashion a remedy for contempt that is proportionate to the level of harm committed so long as the court exercises restraint."[21] "In all civil cases, a contempt determination must be 'coercive or remedial' rather than punitive."[22] Often, however, in the context of a Status Quo Order, "[t]he only purpose for finding the defendants in contempt and assessing a penalty [] would be to coerce them to

---

[20] *Dickerson*, 1991 WL 208467, at *5 (observing that the exercise of determining whether "the defendants were in technical noncompliance with the Order" was "of no practical value").

[21] *TR Invs.*, 2009 WL 4696062, at *18.

[22] *Mitchell Lane Publ'rs, Inc. v. Rasemas*, 2014 WL 4804792, at *2 (Del. Ch. Sept. 26, 2014).

obey the Order."[23]  But, any coercive rationale regarding Bruck, Rice or Latkin's compliance with an interim Court order is now inapt since the Court has already delivered its post-trial opinion disposing of the underlying action.[24]

As for a remedial purpose, it is hard to see what harm was done by failing to notify Dr. Goldberg about either the litigation expenses or the winding down of Macrophage's research.  Dr. Goldberg does not argue that notice to him would have changed the outcome of either of these decisions; indeed, his ability to alter the outcome seems highly unlikely.  One potential argument Dr. Goldberg could have made is that he should have had the chance to object to Plaintiff incurring substantial litigation fees because, if the Court found it appropriate to shift fees, he would be left with the bill.  This argument holds no weight now that the Court has determined in its post-trial opinion that fee-shifting is inappropriate.[25]  With nothing left to coerce and no showing of harm, there is nothing for the court to remedy.

---

[23] *Dickerson*, 1991 WL 208467, at *4.

[24] Post-Trial Opinion; *Zohar II 2005-I, Limited v. FSAR Hldgs., Inc.*, C.A. 12946-VCS (Del. Ch. Apr. 7, 2021) (TRANSCRIPT) at 10.

[25] Post-Trial Opinion at 54–57.

### B. Motion to Dismiss

Dr. Goldberg next seeks wholesale dismissal of this action—weeks after trial—on the ground that the Board never authorized the filing of the case and, therefore, Macrophage has no standing to sue. Remarkably, Dr. Goldberg has elected to press for dismissal without citing a single case, statute or rule that would justify the extraordinary relief he seeks. "[I]n all but the simplest motions, counsel is required to develop a reasoned argument supported by pertinent authorities."[26] Dr. Goldberg's "failure to cite any authority in support" of his legal argument that a lack of formal Board authorization requires dismissal of this case "constitutes a waiver of the issue."[27] This Court is not obligated nor inclined to perform "counsel's work for him or her."[28]

Notwithstanding the lack of citations in the original motion, the Court will address the motion on the merits and will evaluate the authorization claim as a

---

[26] *Gonzalez v. Caraballo*, 2008 WL 4902686, at *3 (Del. Super. Ct. Nov. 12, 2008).

[27] *Flamer v. State*, 953 A.2d 130, 134 (Del. 2008); *State v. Holmes*, 2012 WL 4086169, at *5 n.9 (Del. Super. Ct. Aug. 23, 2012) ("Holmes' failure to provide any support for his legal arguments would ordinarily justify waiver of those claims.").

[28] *Gonzalez*, 2008 WL 4902686, at *3.

motion to dismiss under the more forgiving Rule 12(b)(1) standard since, even under that standard, the motion still fails.[29]  Under Rule 12(b)(1), "[s]tanding is a threshold jurisdictional requirement."[30]   As noted, the plaintiff bears the burden of demonstrating subject matter jurisdiction.[31]  "In deciding whether the plaintiff has met that burden, the Court need not accept the plaintiff's factual allegations as true and is free to consider facts not alleged in the complaint."[32]

---

[29] *See B&B Fin. Servs., LLC v. RFGV Festivals*, LLC, 2019 WL 2006487, at *3 (Del. Super. Ct. May 2, 2019) (noting that when a plaintiff is faced with a Rule 12(b)(1) motion, "the burden of establishing the Court's subject matter jurisdiction rests with the party seeking the Court's intervention" (cleaned up)). *Contra id.* ("On a motion to dismiss pursuant to Rule 12(b)(6), the moving party bears the burden of demonstrating that 'under no set of facts which could be proven in support of its [complaint] would the [plaintiff] be entitled to relief.'" (alterations in original)).  To be clear, Rule 12(b)(6) is the appropriate paradigm under which to evaluate Dr. Goldberg's bid for dismissal.  *See Appriva S'holder Litig. Co. v. EV3, Inc.*, 937 A.2d 1275, 1285 (Del. 2007) ("[W]here a party is not arguing that the court lacks the authority to grant the relief requested to any plaintiff (i.e., lacks subject matter jurisdiction), but rather is arguing that the court cannot grant relief to these particular plaintiffs, the motion is more properly decided under Rule 12(b)(6) . . . .").  This would place the burden on Dr. Goldberg to overcome the plaintiff-friendly presumptions inherent in Rule 12(b)(6).  But, as stated, even if the burden rests with Plaintiff to justify the Court's exercise of jurisdiction, as contemplated by Rule 12(b)(1), the motion to dismiss still fails.

[30] *Hall v. Coupe,* 2016 WL 3094406, at *3 (Del. Ch. May 25, 2016).

[31] *Lewis v. AimCo Props., L.P.*, 2015 WL 557995, at *2 (Del. Ch. Feb. 10, 2015).

[32] *In re WeWork Litig.*, 2020 WL 7343021, at *5 (Del. Ch. Dec. 14, 2020).

Macrophage maintains it has standing to sue because the litigation was properly authorized. Despite Dr. Goldberg's insistence that Board authorization for litigation is necessary in all circumstances, that is not our law. Under 8 *Del. C.* § 122(2), "[e]very corporation created under this chapter shall have power to . . . [s]ue and be sued in all courts . . . ." As Macrophage correctly argues, while a charter can include a provision requiring board approval to authorize litigation, Macrophage's certificate of incorporation has no such provision.[33] The Macrophage Bylaws provide, however, that the CEO of Macrophage shall have the authority to engage in the "general and active management of the business of the corporation . . . ."[34] Thus, barring an explicit prohibition in Macrophage's certificate of incorporation, it was well within Latkin's power, as CEO, to authorize the company to file claims against Dr. Goldberg.

Even assuming board authorization was required (it was not), the informal authorization of Bruck and Rice, as Macrophage's only disinterested directors, was

---

[33] Opp'n at 31.

[34] *Id.*

sufficient. As Dr. Bruck explained at trial, she and Rice met as Macrophage directors after a Navidea board meeting to discuss bringing this litigation against Dr. Goldberg, ultimately concluding that it was in the best interest of Macrophage to do so.[35] There was no requirement for a formal resolution to give effect to this decision. So, whether viewed as a decision within the authority of Latkin as CEO, or as a decision within the authority of Dr. Bruck and Mr. Rice as a majority of the Board, pursuant to both the Macrophage Bylaws and Delaware law, the decision to initiate this litigation was duly authorized. And, to reiterate, Dr. Goldberg points to *nothing* under Delaware law, and I mean nothing, that states or even suggests *formal* Board authorization was required before the Company could sue. Accordingly, the post-trial motion to dismiss must be denied.[36]

---

[35] Trial Tr. 684:13–685:4 (Bruck).

[36] Once again, it is worth observing that Dr. Goldberg's delay in bringing his dismissal application is troubling and indicative of gamesmanship. He has professed for quite some time that, in his view, Dr. Bruck and Mr. Rice were not proper members of the Board and, therefore, he presumably had a basis to raise a challenge to their authority to authorize this litigation long before he sought dismissal (weeks after trial!). Trial Tr. 420:24–421:8 (Goldberg); *id.* at 511:19–512:3 (Goldberg); *id.* at 564:6–11 (Goldberg). It is hard to imagine a more suitable candidate for laches treatment than this belated bid to dismiss an action, again, after the trial of the matter has concluded. There is knowledge; there is inexcusable delay; and there is clearly prejudice. *See Reid v. Spazio*, 970 A.2d 176, 182–83 (Del. 2009) (holding that "laches generally requires the establishment of three things:

### III.    CONCLUSION

For the foregoing reasons, the motion for contempt and to dismiss the action is

DENIED.

**IT IS SO ORDERED.**

Very truly yours,

*/s/ Joseph R. Slights III*

---

first, knowledge by the claimant; second, unreasonable delay in bringing the claim; and third, resulting prejudice . . .").  Laches is yet another reason the motion to dismiss fails.