## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| IN RE WORLD WRESTLING ENTERTAINMENT, INC. MERGER LITIGATION | CONSOLIDATED C.A. No. 2023-1166-JTL |

### MEMORANDUM OPINION IMPOSING SANCTIONS FOR SPOLIATION

Date Submitted: May 13, 2026
Date Decided: May 26, 2026

Kimberly A. Evans, Lindsay K. Faccenda, Irene R. Lax, Robert Erikson, BLOCK & LEVITON LLP, Wilmington, Delaware; Gregory V. Varallo, Anthony M. Calvano, Tayler D. Bolton, Alexander J. Rigby, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware; Jason M. Leviton, Nathan Abelman, BLOCK & LEVITON LLP, Boston, Massachusetts; Rebecca Boon, Mark Lebovitch, Jonathan D'Errico, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; Brian J. Robbins, Stephen J. Oddo, Richard N. Lozano, ROBBINS LLP, San Diego, California; Richard A. Maniskas, RM LAW, P.C., Berwyn, Pennsylvania; *Attorneys for Plaintiffs*.

Michael A. Pittenger, T. Brad Davey, Nicholas D. Mozal, Adriane M. Kappauf, Megan R. Thomas, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Sandra C. Goldstein, Stefan Atkinson, Haley S. Stern, KIRKLAND & ELLIS LLP, New York, New York; *Attorneys for Defendant Vincent K. McMahon*.

William M. Lafferty, Ryan D. Stottmann, Alexandra M. Cumings, Jacob M. Perrone, Jialu Zou, Anneliese Ostrom, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Michele D. Johnson, Kristin N. Murphy, Ryan A. Walsh, Allison O'Hara, LATHAM & WATKINS LLP, Costa Mesa, California; Colleen C. Smith, LATHAM & WATKINS LLP, San Diego, California; Jordan Mundell, LATHAM & WATKINS LLP, San Francisco, California; *Attorneys for Defendants Nick Khan, Paul Levesque, George A. Barrios, and Michelle D. Wilson*.

**LASTER, V.C.**

The plaintiffs contend that a corporation's controlling stockholder steered a sale of the company to his longtime friend. In return, the controlling stockholder received a senior role at the post-transaction company and help dealing with a federal investigation into his alleged sexual misconduct. Discovery revealed that the controlling stockholder and the company's senior officers communicated using ephemeral messages.

Signal is a messaging application. Users can adjust its auto-deletion settings to apply to all their chats or to individual chats. Signal's default setting preserves messages indefinitely, but the user can enable auto-deletion for all chats. For individual chats, any participant can enable auto-deletion or adjust the setting for all participants in the chat. That means that one participant can cause messages on another participant's application to disappear.

After receiving litigation holds, the controlling stockholder and the senior officers did not take any steps to check the settings on their Signal apps and chats. Not only that, but they manually changed the auto-deletion settings for individual Signal chats to implement short-fuse destruction periods measured in hours or less. Those changes resulted in the loss of the existing messages in those chats and meant that any future messages would quickly disappear.

The plaintiffs moved for sanctions based on spoliation of evidence, including electronically stored information ("ESI"). This decision finds that spoliation occurred and that the controlling stockholder and the senior officers acted recklessly—at a minimum—in allowing the spoliation to occur.

As a consequence, the court will presume the truth of a limited number of facts relating to the conduct and motivations of two defendants: the controlling stockholder and the senior officer who openly encouraged Signal use. Presuming those facts to be true forces the defendants to deal with the evidentiary uncertainty that the Signal users created. The defendants remain free to present their case at trial and convince the court to find differently.

In addition, the court will elevate the standard of proof for overcoming the presumed facts from a preponderance of the evidence to clear and convincing evidence. Elevating the burden recognizes that the plaintiffs lack access to the spoliated evidence and therefore cannot use it in their case in chief or to impeach the defendants' testimony. Elevating the standard of proof levels the playing field by forcing the defendants to make a convincing case for their position.

## I. FACTUAL BACKGROUND

The facts are drawn from the operative complaint and the parties' submissions in connection with the sanctions motion.[1] What follows are not formal factual findings, but rather how the record appears at this stage of the case.

### A. Vince And The Company

Vincent K. McMahon is a larger-than-life figure in the world of professional wrestling. He co-founded World Wrestling Entertainment, Inc. ("WWE" or the

---

[1] Citations in the form "Compl. ¶ __" refer to paragraphs of the operative complaint. Citations in the form "Ex. __ at __" refer to exhibits the plaintiffs submitted in connection with their motion for sanctions and reply brief.

"Company") in 1982 with his wife Linda McMahon.[2] From 1982 until 2009, Vince served as WWE's Chairman, and Linda served as CEO. After Linda left the Company in 2009, Vince took over as CEO while continuing to serve as Chairman. Vince was always the Company's controlling stockholder with the ability to exercise a supermajority of its outstanding voting power.[3]

Before the merger challenged in this litigation, the Company principally engaged in the production and distribution of wrestling entertainment content and related products. Its stock traded publicly on the New York Stock Exchange under the ticker symbol "WWE."

**B.     The Misconduct Allegations**

In March and April 2022, the Company's board of directors (the "Board") received a series of anonymous emails alleging that Vince had a sexual relationship with a former Company employee and paid $3 million to cover it up. Other women came forward with additional allegations of sexual harassment, sexual abuse, and hush-money payments.

---

[2] My ordinary practice is to refer to individuals by surnames without honorifics. Because there are multiple individuals involved in the case with the surname McMahon, this decision uses their first names after their initial appearance. That usage is for clarity. It is not intended to imply familiarity or convey disrespect.

[3] As of April 2, 2023, Vince owned (i) 28,682,948 shares of high-vote Class B common stock and (ii) 69,157 shares of Class A common stock. Through his holdings, Vince could wield 81% of the Company's outstanding voting power.

In June 2022, the Board formed a special committee to investigate the allegations (the "Special Committee"). The results of the Special Committee's investigation have not been made public, but the *Wall Street Journal* published an article detailing survivor reports about sexual harassment, sexual abuse, and hush-money payments totaling nearly $15 million.

## C. The Misconduct Hold

On June 21, 2022, WWE's Assistant General Counsel circulated a legal hold notice addressing the misconduct allegations against Vince (the "Misconduct Hold"). The recipients included Vince, his Chief of Staff Brad Blum, Company President Nick Khan, Chief Content Officer Paul Levesque, and his daughter and Company executive Stephanie McMahon.[4] It stated:

> On June 15, 2022, an article was published by the Wall Street Journal which reported that WWE's board of directors has been conducting an investigation into: a purported relationship involving . . . [Vince] McMahon and a former WWE employee; a monetary payment allegedly made by [Vince] to the former employee; a separation agreement allegedly entered into by the Company and the former employee; and, purported additional relationships between [Vince] . . . and one or more Company employees that also involve allegations of sexual relationships, monetary payments and related agreements (the "Matter").[5]

The Misconduct Hold instructed its recipients that that they must "**preserve and retain** all documents and ESI described in this Record Hold Notice."[6]

---

[4] *See* Ex. 1.

[5] *Id.* at 1.

[6] *Id.* (emphasis in original).

4

The Misconduct Hold specified that the recipients "**must suspend any procedures which you control that could delete, destroy or alter any documents or ESI, including emails, PowerPoint slides, presentations, spreadsheets, electronic documents, hard copy documents or other materials that may be relevant to the Matter**."[7] The legal hold specifically referred to "instant messages" and "text messaging."[8] The legal hold later reiterated that "**you must take all reasonable steps necessary to prevent the destruction or deletion of documents**."[9] The legal hold further emphasized that "**[i]f your settings for emails, text messages or otherwise includes automatic deletion protocols, it is your responsibility to ensure that Relevant Documents, including relevant emails and text messages, are preserved**."[10]

The Misconduct Hold made clear that it applied to documents created in the future. It stated: "The duty to preserve Relevant Documents applies not just to documents that already exist, but also to **documents created in the future (including new emails)**. Accordingly, be sure to preserve all hard copy and electronic Relevant Documents that you create or that you receive in the future."[11]

---

[7] *Id.* at 2 (emphasis in original).

[8] *Id.* at 3.

[9] *Id.* (emphasis in original).

[10] *Id.* (emphasis in original).

[11] *Id.* (emphasis in original).

The Misconduct Hold cast a wide net. After instructing recipients to retain documents relevant to Vince's alleged misconduct, the Misconduct Hold identified more specific categories, including:

- "All documents that relate to or potentially relate to, involve, or concern the allegations against Vincent K. McMahon."

- "All documents that relate to or potentially relate to, involve, or concern an alleged relationship between Vincent K. McMahon and any employee of WWE."

- "All documents that relate to or potentially relate to, involve, or concern any investigation conducted by WWE regarding an alleged relationship between alleged relationship between Vincent K. McMahon and any employee of WWE."

- "All documents that relate to or potentially relate to, involve, or concern any agreements between WWE and any WWE employee in connection with the Matter."[12]

The Misconduct Hold did not suggest or imply that the categories were exclusive. In other words, a document relevant both to a topic identified in the Misconduct Hold and another topic would fall within the scope of the Misconduct Hold.

## D. Vince's Hiatus

On July 22, 2022, one month after the issuance of the Misconduct Hold, Vince retired from his roles as CEO and Chairman. Stephanie took over as Chair. She and Khan became co-CEOs.

On August 5, 2022, the U.S. Department of Justice sent WWE a request for information regarding Vince's alleged misconduct. *That same day, Khan manually*

---

[12] *Id.* at 2.

*changed the auto-delete setting for a Signal chat with Vince to delete messages after one hour. The preceding day, Blum had manually changed the auto-delete setting for a Signal chat with Vince to delete messages after one hour.*

**E.     Endeavor Approaches Vince About A Deal.**

Endeavor Group Holdings, Inc. ("Endeavor") is a global sports and entertainment company that owns and operates sports properties. One of its subsidiaries owns and manages the Ultimate Fighting Championship ("UFC"). Endeavor's stock trades on the New York Stock Exchange under the ticker symbol "EDR."

Ari Emanuel is the CEO of Endeavor. He and Vince have been friends for over twenty years. Mark Shapiro is the President and Chief Operating Officer for Endeavor.

On July 22, 2022, the day Vince resigned from his roles at WWE, Shapiro texted with another senior executive at Endeavor. He wrote:

> Nick [Khan] and Stephanie are going to take over the WWE for the next nine months. At the end of the nine months Vince [will] be back with a new board or he will take the company private or he will sell it/coming to us. The race is on. The courtship is on.[13]

The other executive replied, "Let's go."[14] Shapiro's message links the eventual merger to Vince's hiatus from WWE and the misconduct allegations that caused it.

---

[13] Ex. 3.

[14] *Id.*

7

On August 8, 2022, Emanuel invited Vince to lunch on August 10. Vince suggested bringing Khan and Stephanie. Emanuel was enthusiastic.

Jeff Sine is another key player in the story. He is an investment banker with The Raine Group ("Raine") and has served as Emanuel's longtime financial advisor. In preparation for the August 10 meeting, Sine sent Emanuel a presentation titled "Project Stunner" that described a potential deal with WWE.

During the lunch on August 10, Vince, Khan, Stephanie, and Emanuel discussed a potential transaction between Endeavor and WWE. *That same day, Stephanie manually changed the auto-delete setting for a Signal chat with Vince to delete messages after one hour.*

Eleven days later, on August 21, 2022, Sine met with Vince and reviewed a version of the Project Stunner presentation. On August 22, Emanuel texted Vince to say, "I know you met with Jeff Sine yesterday."[15] *That same day, Blum manually changed the auto-delete setting for a Signal chat with Vince to delete messages after eight hours.*

Emanuel and Vince set up a call for the following day, August 23, 2022. On August 28, Sine proposed to switch sides and represent Vince instead of Endeavor in connection with any transaction. Vince responded enthusiastically.[16]

---

[15] Ex. 5.

[16] Ex. 7 ("I Love that idea Jeff" with two thumbs-up emojis).

**F.      Vince's Discussions With Emanuel Intensify.**

In September 2022, Emanuel told Vince expressly that if WWE engaged in a transaction with Endeavor, then he could help Vince with the federal investigation into his alleged misconduct at WWE. In one voicemail message, Emanuel stated:

> I spoke to my lawyer from Latham. Just FYI. Everybody at the DOJ is former Latham lawyers so on that side will be helpful. SEC of course is SEC, but that's just a penalty. As it relates to everything else, yes we can indemnify you and we will. If it's criminal of course you can't stop criminal, but this is not criminal. Call me when you get a chance.[17]

In another voicemail message, Emanuel stated: "I really do think that we all need to get together and talk through all the issues. Because I think whether it be the DOJ or anything, there's ways around this to figure this out, and I don't know what you're hearing or thinking, so give me a call if you have five seconds."[18] Both messages link the deal with Endeavor to the misconduct allegations against Vince.

In November 2022, the discussions about a deal intensified. Between November 10 and 12, Sine and Emanuel had nine separate telephone calls. On November 20, Vince asked Raine to analyze a management buyout ("MBO"). On November 21, Vince and Sine had an eight minute call. That same day, Vince asked a colleague for a draft letter pledging to reimburse the Company for the costs of investigating the misconduct allegations. *Also that same day, Khan repeatedly*

---

[17] Ex. 8.

[18] Ex. 9.

9

*changed the auto-delete setting for a Signal chat with Vince. As a result of those changes, the chat was set to delete messages after one hour.*

## G.    Vince Returns.

On December 13, 2022, Vince, Khan, and Stephanie met with Emanuel and Shapiro to continue the merger discussions. Immediately after the dinner, Vince left Sine a message telling him that he had a "very good meeting" with Emanuel and that "I think it probably is the best thing to do is to go forward with the deal with Ari."[19] He added that "it solves a lot of problems" and that "together I think it's a stronger situation than either one of us on our own."[20] He concluded that while he had not committed to Emanuel, he was "pretty sure that's the way I want to go now" because it was "easier, faster, and all that other kind of stuff."[21]

One week later, on December 20, 2022, Vince sent a letter to the Board proposing that the Company launch a review of strategic alternatives, including a potential sale. Vince noted that any potential counterparty would likely want to speak with him and have his support as the Company's majority stockholder. He therefore proposed that the directors invite him back as "Executive Chairman." He asked the Board to respond by January 3, 2023.

---

[19] Ex. 11.

[20] *Id.*

[21] *Id.*

By letter dated December 27, 2022, the Board advised Vince that it would initiate a strategic review process. The Board also stated it would welcome Vince to play a role in the strategic review process but rejected his proposal to return as a director. The Board offered to enter into a settlement with Vince under which the Company would not sue him if Vince agreed to pay for the millions of dollars the Company had incurred in investigation-related expenses.

By letter dated December 31, 2022, Vince told the Board that his return to the Company was necessary and that the Board's position was unacceptable. He stated that "unless I have direct involvement and input as Executive Chairman from the outset, I will not be able to support or approve any media rights deals or strategic transaction (including any commitments made by or on behalf of the Company regarding a potential transaction or process)."[22] *On the same day Vince sent his letter, Blum manually changed the auto-delete setting for a Signal chat with Vince to delete messages after one day.*

On January 3, 2023, the Board reiterated that it would not be in the Company's best interests for Vince to return to the Company because of pending government investigations. Vince called Emanuel three times that day. *That same day, Khan manually changed the auto-delete setting for a Signal chat with Vince to delete any messages after three hours.*

---

[22] Compl. ¶ 64.

On January 5, 2023, before receiving the Board's response, Vince acted by written consent to remove three independent directors. He replaced them with two allies and himself. The next day, two independent directors resigned in protest. One was the Company's lead independent director. The Company then issued an announcement stating that "the Board ceased to be comprised of a majority of independent directors."[23] *That same day, Khan manually changed the auto-delete setting for a Signal chat with Vince, Levesque, and Stephanie to delete any messages after three hours.*

On January 10, 2023, Vince resumed his post as Executive Chair. Khan continued as sole CEO. Vince's daughter Stephanie resigned to facilitate those changes. That same day, the Company announced that it was exploring strategic alternatives.

The message Shapiro sent to his colleague at Endeavor on the day Vince resigned had predicted correctly what would happen. It was just happening after six months rather than nine.

## H. The Sale Process Begins.

On January 12, 2023, the Board held a special meeting to discuss the exploration of strategic alternatives. On January 13, 2023, WWE retained Raine—Emanuel's longtime financial advisor—as a third financial advisor. WWE had already retained J.P. Morgan and Moelis.

---

[23] *Id.* ¶ 38.

That day also saw Vince sign a settlement agreement resolving claims of alleged sexual misconduct. He also spoke with Emanuel by phone. *That same day, Vince manually changed the auto-deletion settings for two Signal chats, one with Khan and the other with Levesque. Vince changed both to delete after one day. Blum separately changed the auto-deletion setting for a Signal chat with Vince and Khan to delete after one day.*

On January 17, 2023, the Board's financial advisors—Raine, J.P. Morgan, and Moelis—began contacting potential bidders. Sine and Emanuel spoke repeatedly during January. Sine called Emanuel eight times, and Emanuel contacted Sine twenty-one times.

## I.    The Sale Process Hold

On January 19, 2023, WWE's Assistant General Counsel circulated another legal hold notice, this time addressing matters related to Vince's return to the Company and the decision to evaluate strategic alternatives (the "Sale Process Hold").[24] The recipients included Vince, Stephanie, Khan, Blum, and Levesque. It stated:

> The Company has become aware of certain lawsuits that have been filed relating to recent events at WWE, including changes to the composition of the Board, amendments to the Company's bylaws, changes to the Company's executive team, and the investigation by the Special Committee of the Board. In addition, investigations by certain governmental entities, including the U.S. Attorney's Office for the

---

[24] *See* Ex. 13.

13

Southern District of New York and the Securities & Exchange Commission (SEC) remain ongoing.[25]

The Sale Process Hold explained that "it is essential that WWE and its employees **preserve and retain** all documents and ESI (including emails, texts and other electronic communications) described in this Record Hold Notice."[26]

Like the Misconduct Hold, the Sale Process Hold specified that the recipients "**must suspend any procedures which you control that could delete, destroy or alter any documents or ESI, including emails, texts and other electronic communications, PowerPoint slides, presentations, spreadsheets, electronic documents, hard copy documents or other materials that may be relevant**."[27] Like the Misconduct Hold, the Sale Process Hold specifically referred to "instant messages" and "text messaging."[28] It later reiterated that "**you must take all reasonable steps necessary to prevent the destruction or deletion of documents**."[29] The legal hold further emphasized that "**[i]f your electronic mail or text settings include automatic deletion protocols, it is your**

---

[25] *Id.* at 1.

[26] *Id.* (emphasis in original).

[27] *Id.* (emphasis in original).

[28] *Id.* at 3.

[29] *Id.* at 3–4 (emphasis in original).

14

**responsibility to ensure that Relevant Documents, including relevant electronic mail and text messages, are preserved**."[30]

In addition to instructing recipients to retain documents generally relevant to the litigations and investigations, the Sale Process Hold identified more specific categories, including all documents and communications concerning:

- "The investigation by the Special Committee";
- "The decision by McMahon to temporarily step down as CEO";
- "Correspondence between McMahon and the Board";
- "The written consent of January 5, 2023";
- "The negotiation and/or re-negotiation of WWE's media rights deals"; and
- "The recently-announced review of strategic alternatives."[31]

Like the Misconduct Hold, the Sale Process Hold made clear that it applied to documents created in the future, stating: "The duty to preserve Relevant Documents applies not just to documents that already exist, but also to **documents created in the future (including new electronic communications)**. Accordingly, be sure to preserve all hard copy and electronic Relevant Documents that you create or that you receive in the future."[32]

---

[30] *Id.* at 4 (emphasis in original).

[31] *Id.* at 2.

[32] *Id.* at 4 (emphasis in original). The Company issued another hold notice on May 23, 2023, that went into greater detail about the merger. *See* Ex. 14. The third hold did not alter any of the preservation obligations already in existence.

**J.     The Sale Process Continues.**

On February 6, 2023, the Company began entering into confidentiality agreements with potential bidders. The next day, Endeavor submitted a proposal to combine its UFC subsidiary with the Company to form TKO Group Holdings, Inc. ("TKO"). Endeavor envisioned a transaction in which WWE stockholders could choose between cash or stock, with the consideration valued at $88.43 per share, and with Endeavor paying a maximum of $2 billion in cash. If no Company stockholders elected to receive cash, resulting in the greatest possible dilution for Endeavor, then Endeavor would own 57% of the combined business.

On February 24, 2023, the Company told interested bidders that any written indications of interest must be received by March 13. The Company did not tell potential bidders that Endeavor had submitted its offer weeks before, that Endeavor was already far along in its due diligence process, or that Emanuel and Shapiro had already met with Vince and Khan to discuss Endeavor's offer.

By March 13, 2023, the Company had received three other expressions of interest in a whole company sale. Liberty Media Corporation ("Liberty") proposed to acquire the Company for cash in the range of $95 to $100 per share. KKR proposed to acquire the Company for cash in the range of $90 to $97.50 per share. Base 10 proposed to acquire the Company for a mix of stock and cash in the range of $76.83 per share. None of the bidders gave any indication that they intended to retain Vince.

16

**K.    A Post-Deal Position For Vince Becomes A Key Term.**

Vince and the Board did not respond substantively to Liberty, KKR, or Base 10. They negotiated exclusively with Endeavor, even though its proposal carried a lower value than the Liberty and KKR offers.

On March 21, 2023, Vince and the Board countered Endeavor's proposal with an all-stock deal with no cash election. The surviving company's board would have eleven seats, six appointed by Endeavor and five by WWE. Emanuel would be the CEO of the combined company. The five WWE directors would select the Executive Chair. The term sheet implied a value for WWE of $95.66 per share. That value fell at the low end of Liberty's opening range and toward the upper end of KKR's range.

On March 22, 2023, Vince and Khan met with Emanuel and Shapiro to discuss the deal. They agreed in principle to the all-equity consideration and the 51/49% split.

On March 23, 2023, Endeavor submitted a revised term sheet that incorporated the new 51/49% split. It also proposed that Vince would (1) serve as Executive Chair of the combined company until his death, resignation, or incapacity, (2) select five of the eleven directors on the combined company's board, and (3) enjoy veto rights over various corporate actions. Those rights were later incorporated in a governance agreement.

The merger agreement was finalized on April 1, 2023. At the time, Emanuel, Vince, and Khan were together at Wrestlemania 39 in Los Angeles, California. On April 3, the Company announced the deal. It closed on September 12.

**L.      This Litigation**

Various plaintiffs now representing a class of the Company's stockholders filed suit in November 2023. They contend that Vince and his fellow directors breached their fiduciary duties in connection with the merger. One of the plaintiffs' principal theories asserts that Vince steered the deal to Endeavor and his friend Emanuel because he knew he would have a role with the surviving company, receive help with the legal fallout from his alleged sexual misconduct, and be indemnified.

Discovery has been extensive. As part of discovery, Vince disclosed that federal agents had seized his iPhone and iPad (the "Seized Devices") in July 2023 as part of their investigation into his alleged misconduct. Vince disclosed that there could be discoverable information on the Seized Devices that was not otherwise available because Signal stores data locally.

In September 2025, the government returned the Seized Devices. Vince's counsel conducted a forensic analysis of the Seized Devices that identified when each Signal chat was created, who participated in it, and whether any participant adjusted the retention settings. The contents of the chats, however, were no longer available.

## II.      LEGAL ANALYSIS

The plaintiffs contend that Vince, Stephanie, Khan, Blum, and Levesque (the "Signal Users") spoliated evidence by not checking the Signal application's message settings to ensure that messages were preserved after receiving the Misconduct Hold

and later the Sale Process Hold, then manually changing individual chat settings so that prior messages would be destroyed and future messages deleted.[33]

"Spoliation is the destruction or significant alteration of evidence, the failure to preserve evidence properly for another's use, or the improper concealment of evidence."[34] Court of Chancery Rule 37(e) addresses the failure to preserve ESI. It states:

> If ESI that should have been preserved in the reasonable anticipation of or actual notice of imminent litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted recklessly or with the intent to deprive another party of the information's use in the litigation, may, among other things:
>
> > (A) presume that the lost information was unfavorable to the party; or
> >
> > (B) dismiss the action or enter a default judgment.[35]

Signal chats are ESI, so Rule 37(e) applies.

---

[33] The plaintiffs also contend that Khan deleted specific text messages and that Vince and Blum failed to preserve hard copy documents. The Signal messages are the main event. The remedy that the court imposes for the spoliation of the Signal chats also remedies any spoliation involving specific text messages and hard copy documents.

[34] *Goldstein v. Denner*, 310 A.3d 548, 567 (Del. Ch. 2024).

[35] Ct. Ch. R. 37(e) (formatting altered).

To obtain sanctions for a party's failure to preserve ESI, the requesting party must show (i) the responding party had a duty to preserve the ESI, (ii) the ESI is lost, (iii) the loss is attributable to the responding party's failure to take reasonable steps to preserve the ESI, and (iv) the requesting party suffered prejudice. For an adverse inference or case-dispositive sanctions, the plaintiff must show that the responding party acted recklessly or intentionally when failing to preserve ESI.[36]

## A.     The Threshold Issue Of Timing

When considering a motion addressing spoliation, there is always a threshold question of timing.[37] The defendants argue that the court should defer ruling on the plaintiffs' motion until after trial.

Rule 37 does not contain any specific reference to the timing of the filing of a motion seeking spoliation sanctions.[38] "Delaware trial courts have inherent power to control their dockets."[39] That authority includes determining how a case should proceed for the "orderly adjudication of claims."[40]

---

[36] *Goldstein*, 310 A.3d at 557.

[37] *In re Facebook Inc. Deriv. Litig.*, 2025 WL 262194, at *6 (Del. Ch. Jan. 21, 2025); *Goldstein*, 310 A.3d at 569.

[38] *See* Ct. Ch. R. 37; *Goldstein*, 310 A.3d at 570.

[39] *Solow v. Aspect Res., LLC*, 46 A.3d 1074, 1075 (Del. 2012).

[40] *Unbound P'rs Ltd. P'ship v. Invoy Hldgs. Inc.*, 251 A.3d 1016, 1030 (Del. Super. 2021) (internal quotation marks omitted).

20

As a general matter, Rule 37 is a rule about discovery, implying that a motion under Rule 37(e) should generally be part of the discovery process. Nevertheless, determining when to address a spoliation motion "rests in the discretion of the court based on the facts of each case."[41] Pertinent factors include "the nature of the [spoliation] issue, the stage of the case, the court's ability to provide case-specific relief, and any scheduling order that might apply."[42] "If a party seeks an order compelling the defendants to provide additional discovery or to pay for the movant to conduct additional discovery, then it would be foolish to defer the motion until trial."[43] Along similar lines, "[i]f a ruling on the motion will help the parties prepare for trial or limit the issues to be addressed at trial, then it often will make sense to address the motion before trial."[44] But "[i]f the motion turns on evidentiary issues that the court will evaluate at trial, then it will make sense to defer the motion until trial."[45]

Here, the motion rests on undisputed facts regarding the failure to preserve ESI and affirmative steps to change automatic deletion settings for ESI. The motion does not turn on disputed facts that would warrant an evidentiary hearing or post-trial adjudication. The defendants argue that the court should defer ruling on the

---

[41] *Goldstein*, 310 A.3d at 571.

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] *Id.*

motion so it can observe the Signal Users' credibility before making a finding of intent, but recklessness provides an adequate basis for the sanctions the plaintiffs request.

Equally important, the plaintiffs seek remedies that will affect how trial unfolds. Whether the court grants those sanctions will affect how the parties prepare for trial and present their evidence. The proper time to consider the plaintiffs' motion is now.[46]

## B. Was There A Duty To Preserve The Signal Chats?

Under Rule 37(e), the first question is whether the ESI "should have been preserved."[47] "Rule 37(e) does not apply . . . when information or evidence is lost before a duty to preserve attaches."[48]

A party must "preserve potentially relevant evidence as soon as the party either actually anticipates litigation or reasonably should have anticipated

---

[46] United States District Judge Iain D. Johnston has provided particularly helpful and characteristically insightful guidance on the timing of spoliation motions. *See Groves Inc. v. R.C. Bremer Mktg. Assocs.*, 2024 WL 4871368 (N.D. Ill. Nov. 22, 2024). Applying his framework, the court here has access to the specific facts necessary to decide the motion, and the remedy sought will affect how the parties approach trial, which is the next key stage in the case. *Cf. id.* at *5–6. But as he explains, when to rule on a spoliation motion requires a case-by-case call. *See id.* at *6.

[47] Ct. Ch. R. 37(e).

[48] *Goldstein*, 310 A.3d at 571 (quoting *Living Color Enters., Inc. v. New Era Aquaculture, Ltd.*, 2016 WL 1105297, at *4 (S.D. Fla. Mar. 22, 2016)).

litigation."[49] "A party is not obligated to preserve every shred of paper, every e-mail or electronic document."[50] But a party is obligated to "preserve what it knows, or reasonably should know, is relevant to the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request."[51] "An organization's decision to circulate a litigation hold notice is a strong indication that a duty to preserve evidence exists, because it shows that the organization subjectively anticipated litigation."[52]

The Signal Users accept that an obligation to preserve documents existed on June 21, 2022, when the Company circulated the Misconduct Hold, but they maintain that the Misconduct Hold only encompassed materials relating to Vince's alleged misconduct. As they see it, the Misconduct Hold did not explicitly encompass the sale process or the merger. Nor could it, because the sale process did not formally start until February 2023, and the merger would not take place until months later. The defendants conclude that no duty to preserve sale-process-related documents arose until January 19, 2023, when the Company circulated the Sale Process Hold.

---

[49] *Id.* (footnote omitted); *see also Beard Rsch., Inc. v. Kates*, 981 A.2d 1175, 1187 (Del. Ch. 2009).

[50] *Seibold v. Camulos P'rs LP*, 2012 WL 4076182, at *23 (Del. Ch. Sept. 17, 2012) (internal quotation marks omitted).

[51] *Id.* (internal quotation marks omitted).

[52] *Goldstein*, 310 A.3d at 573.

The defendants' argument falls short because the lost Signal chats could readily address *both* Vince's alleged misconduct and the possibility of a transaction. The evidence adduced in discovery suggests the two were linked. Shapiro immediately understood the connection between Vince's departure and a future deal. Emanuel expressly connected the two concepts in his voicemails. The Signal chats likely included communications addressing both issues.

The Misconduct Hold put the Signal Users on notice that they needed to retain communications related to Vince's alleged misconduct, including communications relating to Vince's alleged misconduct and the merger. As of June 21, 2022, the date of the Misconduct Hold, the defendants took on an affirmative duty to preserve their Signal chats.

The defendants are also incorrect to assert that no duty to preserve sale-process-related documents arose until January 19, 2023, when the Company issued the Sale Process Hold. The duty to preserve information indisputably applied after that date, but the duty actually arose earlier.

In M&A transactions, a duty to preserve can arise before a litigation hold is issued because litigation involving M&A transactions is sufficiently common that sophisticated parties anticipate it.[53] In August 2022, Vince met with Emanuel to discuss a potential transaction, then later met with Sine to discuss a deal. In September 2022, Emanuel made at least two offers to help Vince with the federal

---

[53] *Id.*

24

investigation into his alleged misconduct, as long as WWE engaged in a transaction with Endeavor. By November 2022, discussions about Vince returning to the Company and pursuing a merger with Endeavor had reached a serious stage. On November 20, Vince asked Raine to analyze an MBO. On November 21, Vince and Sine had an eight minute call. That same day, Vince asked President and Chief Financial Officer Frank Riddick for a draft letter pledging to reimburse the Company for the costs of investigating the misconduct allegations.

Vince's plan to return to the Company and pursue a merger in the face of the misconduct allegations against him was a high-risk strategy that would draw litigation. Although it is difficult to mark a specific time when the Signal Users reasonably should have anticipated litigation, that time had arrived by August 31, 2022. As of that date, the Signal Users had a duty to preserve evidence relating to Vince's return and a potential sale of the Company.

## C.    Are The Signal Chats Lost?

The second question in the Rule 37(e) analysis is whether the ESI "is lost."[54] "Information is lost for purposes of Rule 37(e) only if it is irretrievable from another source, including other custodians."[55] "Because [ESI] often exists in multiple

---

[54] Ct. Ch. R. 37(e).

[55] *Goldstein*, 310 A.3d at 574.

locations, loss from one source may often be harmless when substitute information can be found elsewhere."[56]

The Signal Users admit that the Signal chats are lost. They cannot be recovered or obtained from other sources.

## D. Were The Signal Chats Lost Due To A Failure To Take Reasonable Steps To Preserve Them?

The third question in the Rule 37(e) analysis is whether the ESI was lost "because a party failed to take reasonable steps to preserve it."[57] When a party has a duty to preserve evidence, that "party must act reasonably to preserve the information that it knows, or reasonably should know, could be relevant to the litigation, including what an opposing party is likely to request."[58] The party need not preserve all documents in its possession; "it must preserve what it knows and reasonably ought to know is relevant to possible litigation and is in its possession, custody, or control."[59] In determining reasonableness, a court "should be sensitive to the party's sophistication with regard to litigation in evaluating preservation efforts; some litigants, particularly individual litigants, may be less familiar with

---

[56] *Id.* (quoting Fed. R. Civ. P. 37(e) advisory committee's notes).

[57] Ct. Ch. R. 37(e).

[58] *Goldstein*, 310 A.3d at 576.

[59] *Id.* (internal quotation marks omitted).

26

preservation obligations than others who have considerable experience in litigation."[60]

Simply circulating a litigation hold is not sufficient.[61] "The organization must take steps to ensure that the recipients of the hold understand what it means and abide by it."[62] "The organization also must suspend or modify routine document retention or document destruction policies so that evidence is not lost."[63]

Individuals must take similar steps. "[T]hey must disable auto-delete functions that otherwise would destroy emails or texts."[64] "They also must back up data from personal devices before disposing of them."[65] Failing to disable the auto-delete setting or back up messages before deletion demonstrates that a defendant acted unreasonably.[66] Individuals may not claim ignorance. "After receiving a litigation

---

[60] *Id.* (quoting Fed. R. Civ. P. 37(e) advisory committee's notes).

[61] *Id.* at 576–77.

[62] *Id.* at 577.

[63] *Id.*

[64] *Id.*

[65] *Id.*

[66] *See id.* at 577–78.

27

hold, an individual must take steps to determine what is necessary to comply."[67] This includes learning what is necessary "to prevent destruction or automatic deletion."[68]

The Signal Users failed to take reasonable steps to preserve ESI. Starting on June 21, 2022, the Signal Users had a duty to preserve ESI relating to the topics identified in the Misconduct Hold, including any ESI about those topics that touched on a sale process or deal with Endeavor. Starting on August 31, the Signal Users had a duty to preserve ESI relating to Vince's anticipated return to the Company, the sale process, and a deal with Endeavor.

The Signal Users did not take reasonable steps to identify and preserve likely sources of ESI. Instead, they took affirmative steps to delete likely sources of ESI.

Khan both used Signal and encouraged others to use it. After receiving the Misconduct Hold, Khan failed to disable auto-deletion on any Signal chats. Instead, he frequently adjusted the Signal retention settings for individual chats so that past messages would be lost and future messages deleted. After receiving the Sale Process Hold, Khan again failed to disable auto-deletion on any Signal chats.

Instead, Khan encouraged others to shift to Signal. For example, during the middle of the sale process, Khan had the following exchange with Vince:[69]

---

[67] *Id.* at 578.

[68] *Id.* (internal quotation marks omitted).

[69] Ex. 22.



| NK | Nick Khan ▮▮▮▮▮▮ | 2/28/2023, 19:37 |
| | Langis | |
| VM | Vince McMahon ▮▮▮▮▮▮ | 2/28/2023, 19:41 |
| | What in the blue hell is "Langis" lol | |
| NK | Nick Khan ▮▮▮▮▮▮ | 2/28/2023, 19:41 |
| | Read it backwards! | |

The Signal Users correctly observe that the context of the chain does not appear to involve Vince's alleged misconduct, the sale process, or a deal with Endeavor, but the point remains. Khan encouraged the use of Signal. Other examples abound.[70]

Vince used Signal and its ephemeral message feature. After receiving the Misconduct Hold and the Sale Process Hold, Vince did not do anything to check the settings on his phone to ensure that auto-delete was not in operation on any Signal chats. Like Khan, he manually changed auto-deletion settings for selected Signal chats so that past messages would be lost and future messages deleted. Vince testified that he used Signal precisely because of the secrecy it provided.[71]

---

[70] Khan also deleted text messages. Although Khan has no recollection of the contents of his deleted messages, context suggests they cover a broad range of relevant topics, including the investigations into Vince's alleged misconduct, discussions with Emanuel about WWE, and discussions about networks pursuing rights deals. The Signal Users correctly observe that the context for the deleted messages does not always appear to involve these matters, but some do. Khan selectively deleted those texts.

[71] Vince Dep. 254 ("Q. Why were you communicating with Jeff Sine by Signal? . . . A. I was always told about the Signal, and it's good for business because no one can trace you and so forth. So I was playing with it at this time. Q. Okay. And when you mean 'no one can trace you,' what did you understand that to mean? . . . A. It's kind of like Proton. You can't find out much about the call or the text.").

Blum used Signal and its ephemeral message feature. After receiving the Misconduct Hold and the Sale Process Hold, Blum did not do anything to check the settings on his phone to ensure that auto-delete was not in operation on any Signal chats. Like Khan and Vince, Blum manually changed auto-deletion settings for Signal chats so that past messages would be lost and future messages deleted.

Stephanie used Signal and its ephemeral message feature. After receiving the Misconduct Hold and the Sale Process Hold, Stephanie did not do anything to check the settings on her phone to ensure that auto-delete was not in operation on any Signal chats. Like Khan, Vince, and Blum, Stephanie manually changed auto-deletion settings so that past messages would be lost and future messages deleted.

Levesque used Signal and its ephemeral message feature. After receiving the Misconduct Hold and the Sale Process Hold, Levesque did not do anything to check the settings on his phone to ensure that auto-delete was not in operation on any Signal chats.

By not taking steps to disable the auto-delete settings on their Signal chats, the Signal Users failed to take reasonable steps to collect and preserve the ESI. Instead, they affirmatively changed the auto-delete settings to ensure prompt deletion, and Khan selectively deleted text messages.

## E. Prejudice

The imposition of sanctions for spoliation requires a showing of prejudice. Absent prejudice, the failure to preserve ESI need not be remedied because, by definition, no harm was done.

"Prejudice exists when spoliation prevents a party from obtaining and potentially using relevant evidence."[72] Determining whether prejudice exists is difficult because spoliation creates an evidentiary vacuum. Proving the relevance of the lost evidence is difficult "precisely because the evidence no longer exists."[73]

The prejudice analysis starts by requiring that the requesting party "provide some minimal explanation as to why the lost ESI could have been relevant and either admissible in its own right or reasonably likely to lead to the discovery of admissible evidence."[74] The mere fact that evidence is lost is not sufficient to demonstrate prejudice; the requesting party must "provide a plausible explanation as to why the evidence could have been relevant such that the failure to preserve is prejudicial."[75] "'Prejudice' under Rule 37(e) includes the thwarting of a party's ability to obtain the evidence it needs for its case."[76]

Once the party seeking sanctions meets that initial burden, then the party that failed to preserve the ESI must convince the court that the lost ESI did not result in

---

[72] *Goldstein*, 310 A.3d at 583.

[73] *Id.*; *see Hollis v. CEVA Logistics U.S., Inc.*, 603 F. Supp. 3d 611, 623 (N.D. Ill. 2022) ("Establishing prejudice can be a dicey proposition because the ESI is gone.").

[74] *Goldstein*, 310 A.3d at 585.

[75] *Id.* at 584.

[76] *Hollis*, 603 F. Supp. 3d at 623; *accord DR Distributors, LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 981 (N.D. Ill. 2021).

prejudice. Possible reasons include that the material could not have been relevant, would not have been admissible or potentially have led to the discovery of admissible evidence, or otherwise could not have been used by the requesting party to its advantage.[77]

Here, the plaintiffs have provided a plausible explanation as to why the evidence could have been relevant such that its loss is prejudice. The Signal Users communicated about Company business, Vince's alleged misconduct, Vince's return to the Company, the sale process, and the eventual merger. The record reveals extensive backchannelling between and among Vince, Khan, Sine, and Emanuel. The Signal Users specifically changed the auto-deletion settings for individual chats.[78] They took those actions at times that corresponded with key events in the timeline. It is reasonable to infer that the lost ESI would have included candid communications shedding light on the reasons for the merger.

The plaintiffs now lack access to that evidence. They cannot use the messages as affirmative proof. They cannot use the messages to question witnesses. They cannot use the messages to cross examine witnesses. The burden therefore shifts to the spoliators to show a lack of prejudice.

To show that the lost messages did not result in prejudice, the Signal Users argue that none of the spoliated documents were relevant. No one can know that.

---

[77] *Goldstein,* 310 A.3d at 585; *accord Facebook*, 2025 WL 262194, at *10.

[78] Khan also selectively deleted text messages.

Instead, context suggests that the deleted Signal chats and messages were relevant. At this point in the case, the record shows that the Signal Users discussed Vince's resignation, strategized about his legal and reputational difficulties, and engaged in backchannel discussions about Vince's return and a sale of the Company. It is far more likely that the messages contained relevant evidence than that they did not.

Vince argues that because he and Emanuel met openly and left each other voicemail messages about the deal and its link to his alleged misconduct, it makes no sense that they would communicate ephemerally about the same topic. That does not follow. Figures who make public statements do not only communicate in public. Troves of internal communications typically exist regarding the public statements. The same is true about figures who communicate via a discoverable channel while also using ephemeral channels. The existence of the discoverable channel does not foreclose the possibility of candid and probative content on the ephemeral channel. It makes its existence more likely, not less likely.

Khan testified that his *most frequent* use of Signal was for dealing with a foreign entity. Vince similarly testified he *primarily* communicated over email, text messages, phone calls, and using his computer. Taking both statements as true does not mean that neither used Signal chats for relevant and now lost communications. Khan and Vince both used Signal and changed the auto-deletion settings for their

33

chats repeatedly between August 2022 and January 2023. The timing of those changes suggests a close relationship to the matters at issue in this proceeding.[79]

The Signal Users also rely on their own testimony about their purported lack of familiarity with Signal retention settings. Yet the evidence objectively shows that the Signal Users frequently modified the retention settings for their chats. In light of those frequent modifications, their denials cannot be credited.[80] In any event, they were reckless. After receiving the Misconduct Hold, they had a duty to take steps to preserve ESI and consult with WWE's in-house counsel if there was any uncertainty or confusion.

Finally, the Signal Users argue that even if some deleted Signal messages were relevant, losing a small number of messages against an expansive record does not result in prejudice. To that end, they tout the total number of documents they produced.

Discovery has been extensive, with TKO and Endeavor alone producing more than 37,000 documents. Vince's counsel engaged in particularly commendable efforts

---

[79] The same is true for Khan's selective deletion of individual texts. Although context suggests that some of Khan's selectively deleted texts likely lacked relevance to this case, others suggest a close connection.

[80] Vince and Khan gave testimony about Signal use that was notably strained. *E.g.*, Vince Dep. 323 ("Q. If you read that word backwards, it says Signal, right? A. I don't know. I didn't bother reading it. Q. Langis is Signal? A. I don't know. I'd have to take my pencil out and do it. I'll take your word for it."); Khan Dep. 398 ("Q. Langis backwards is Signal; right? A. Yes. Q. Why did you write Signal backwards? A. I have no idea.").

to gather, preserve, and produce evidence. But the comparison stresses a denominator in search of a numerator, because it is impossible to know how many messages were in the lost chat threads. More important, not all litigation documents carry equal weight. The Signal Users selectively destroyed specific Signal chats and messages. Because the Signal Users acted selectively, "it is likely that the most sensitive and probative exchanges are gone."[81]

## F.     The Sanctions Necessary To Cure The Prejudice

Rule 37(e) authorizes a range of sanctions to cure prejudice. The court can deem certain facts to be true, preclude the use of certain evidence, strike particular pleadings or claims, modify the burden of proof for particular issues, allow additional discovery, enter default judgment, and award expenses.[82]

Before the court can draw an adverse inference or enter default judgment, the court must conclude that the party "acted recklessly or with the intent to deprive another party of the information's use in the litigation."[83] "Delaware courts have defined recklessness in the spoliation context as a conscious awareness of the risk

---

[81] *Facebook*, 2025 WL 262194, at *11.

[82] *Goldstein*, 310 A.3d at 583; *see also* Ct. Ch. R. 37(b); *Terramar Retail Ctrs., LLC v. Marion #2-Seaport Tr. U/A/D June 21, 2002*, 2018 WL 6331622, at *14 (Del. Ch. Dec. 4, 2018).

[83] Ct. Ch. R. 37(e)(2).

that one's action or inaction may cause evidence to be despoiled. Intentional destruction simply means that the spoliator acted 'with purpose.'"[84]

"For purposes of recklessness, knowledge of their duty to preserve [communications] coupled with the loss of [communications] and the lack of any explanation [is] dispositive."[85] The Signal Users acted recklessly—at a minimum—by failing to check on the operation of the auto-delete function for their Signal messages, changing the auto-delete settings for individual Signal chats, and selectively destroying messages.

To remediate the prejudice, the plaintiffs ask the court to

- Presume that specified facts are true; and

- Require that the defendants can only overcome the presumed facts through clear and convincing evidence.

Those are appropriate sanctions.

### 1. The Presumed Facts

The plaintiffs principally seek relief in the form of factual presumptions. They do not ask the court to deem facts established. They only seek to shift the burden of proof to the defendants on specific factual issues.

Shifting the burden of proof is a significant sanction but one warranted here. The burden of proof "determine[s] what happens if there is no credible evidence on a

[84] *TR Invs., LLC v. Genger*, 2009 WL 4696062, at *17 (Del. Ch. Dec. 9, 2009) (footnote omitted) (quoting *Beard Rsch.*, 981 A.2d at 1191), *aff'd in part, rev'd in part on other grounds*, 26 A.3d 180 (Del. 2011).

[85] *Goldstein v. Denner*, 2024 WL 776033, at *16 (Del. Ch. Feb. 26, 2024).

topic, or if there is some credible evidence, but not enough that either side could carry a burden by a preponderance."[86] In such a case, the party with the burden of proof loses. In a typical civil case, the plaintiff bears the burden of proof. Shifting the burden of proof changes who wins in the absence of sufficient credible evidence. Because the Signal Users created the absence by selectively deleting Signal chats and texts, they should appropriately bear the burden of that absence.

For purposes of this case, the court will presume the following:

- Emanuel's promise to provide Vince with a continued role at any post-merger company after a transaction influenced Vince's decision-making with respect to the merger.

- Emanuel's offer of indemnification and other legal support related to pending federal investigations of Vince's alleged misconduct influenced Vince's decision-making with respect to the merger.

- Vince decided to pursue a transaction with Endeavor in 2022, before the Company initiated the strategic review process.

- Khan communicated with Emanuel between August and December 2022 to facilitate a transaction between WWE and Endeavor.

- Vince and Khan worked with Raine to steer the process toward a deal with Endeavor and away from other potential bidders.

Those presumed facts represent a subset of the list the plaintiffs requested.

The defendants who are not Signal Users assert that presuming these facts is unfairly prejudicial to them. That is not so. The presumed facts relate to the conduct

---

[86] *Goldstein*, 310 A.3d at 586 (discussing how presumptions and burdens operate).

of Vince and Khan. The court is not presuming that other defendants knew about their actions or were involved.

Even in an entire fairness case, the actions of self-interested fiduciaries do not necessarily result in liability for other defendants. "The entire fairness test is, at its core, an inquiry designed to assess whether a self-dealing transaction should be respected or set aside in equity. It has only a crude and potentially misleading relationship to the liability any particular fiduciary has for involvement in a self-dealing transaction."[87] A finding that a transaction is not entirely fair could lead to transaction-based relief, such as an injunction, rescission, or an equitable modification of the transaction's terms.[88] But to determine whether individual fiduciaries should be held liable, a court must analyze each fiduciary's conduct to decide whether the fiduciary breached the duty of loyalty, including its subsidiary element of good faith, or the duty of care.[89] "The liability of the directors must be determined on an individual basis because the nature of their breach of duty (if any), and whether they are exculpated from liability for that breach, can vary for each

---

[87] *Venhill Ltd. P'ship v. Hillman*, 2008 WL 2270488, at \*22 (Del. Ch. June 3, 2008).

[88] *See, e.g.*, *In re Loral Space & Commc'ns Inc.*, 2008 WL 4293781, at \*32 (Del. Ch. Sept. 19, 2008) (modifying terms of stock issuance to de facto controlling stockholder after finding that terms were not entirely fair).

[89] *See Venhill*, 2008 WL 2270488, at \*22.

director."[90] Establishing presumed facts about Vince and Khan's conduct does not implicate the other defendants.

The defendants remain free to put on their case at trial. They can introduce documents. They can call witnesses. Their witnesses may well testify credibly and overcome the presumption. Nothing stops them from rebutting the presumed facts.

### 2. The Increased Standard Of Proof

The plaintiffs also ask the court to raise the standard the defendants must meet to rebut the presumed facts. This is another significant sanction,[91] but also a logical and measured response to selective deletion. Imposing a higher burden ensures that the defendants must convincingly overcome the uncertainty they created.

In *Genger*, the court imposed a higher burden of proof and then went further, holding that the spoliator "will be unable to prevail on any material factual issue if the only evidence in support of his position is his own testimony."[92] Under that ruling, "[a]bsent corroborating testimony or documents, [the spoliator's] mere word will be insufficient to meet his burden of persuasion."[93]

---

[90] *In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at \*38 (Del. Ch. May 3, 2004).

[91] *See James v. Nat'l Fin. LLC*, 2014 WL 6845560, at \*9 (Del. Ch. Dec. 5, 2014).

[92] *TR Invs., LLC v. Genger*, 2010 WL 541687, at \*2 (Del. Ch. Feb. 3, 2010).

[93] *Id.*

In this case, the court will not go that far. The combination of a narrow set of presumed facts and a heightened standard of proof is sufficient.

### III. CONCLUSION

The motion for sanctions is granted.